Argued October 31, affirmed December 19, 1916.

## PARKER *v.* KELSEY.*

(161 Pac. 694.)

**Gifts—Evidence—Parol Gift of Land.**

1. Evidence in a suit to quiet title *held* sufficient to support a finding that plaintiff's father made a parol gift of the land in question to his daughter during his lifetime.

[As to conveyances which must be regarded as gifts, see note in 65 Am. St. Rep. 798.]

---

*The question as to whether a parol gift is a conveyance is discussed in a note in 67 L. R. A. 461.

On adverse possession by donee under parol gift, see note in 35 L. R. A. 835.                    Reporter.

**Gifts—Parol Gift of Land—Statutes.**

2. Under Section 804, L. O. L., providing that interests in land cannot be created or transferred except by operation of law, or by an instrument in writing, a mere parol gift of realty will not of itself pass title.

**Adverse Possession—Requisites—Effect.**

3. Continuous adverse possession of land for ten years under a claim of title is sufficient to pass to the possessor the fee-simple estate.

**Adverse Possession—Requisites—Parol Gift.**

4. A parol gift of land is sufficient to inaugurate adverse possession.

**Adverse Possession—Effect—Extent.**

5. Where plaintiffs claim by adverse possession inaugurated by a parol gift of land, they may obtain title to the portion actually inclosed only.

From Union: JOHN W. KNOWLES, Judge.

In Banc. Statement by MR. JUSTICE BURNETT.

This is a suit by Violet Parker and Thomas H. Parker, her husband, against Grace Kelsey, widow and executrix of the estate of L. S. Kelsey, deceased, and others, to quiet title to a certain quarter-section of realty in Union County. The complaint alleges that she is the owner in fee simple of the land, and that since the year 1900 she and her husband have been in the continuous, exclusive, visible, open and notorious adverse possession of the tract under assertion of right claiming at all times to own the same as against the whole world.

A demurrer to the complaint was overruled, and the defendants who appeared filed an answer denying all the allegations of ownership in the plaintiffs. That pleading also recites, in substance, that Grace Kelsey is the surviving widow, and that Violet Parker together with certain defendants are daughters of L. S. Kelsey, deceased; that he made a will devising all his real property to his own children and those of a deceased daughter subject to a life annuity of $1,500 per annum to his widow; that at the time of his death the

decedent was the owner in fee of the land in question; and that they deraign title thereto by virtue of his will.

The reply traverses all the new matter of the answer. After hearing the testimony and argument of counsel, the Circuit Court entered a decree quieting the title of the plaintiff Violet Parker to all the land inclosed by her, being the entire quarter, except perhaps five or six acres lying outside her fences. The defendants appeal.                    AFFIRMED.

For appellants there was a brief and an oral argument by *Mr. Charles H. Finn.*

For respondents there was a brief over the name of *Messrs. Crawford & Eakin,* with an oral argument by *Mr. Thomas H. Crawford.*

MR. JUSTICE BURNETT delivered the opinion of the court.

There is no contention in the testimony but that the plaintiffs, Violet Parker and her husband, have been in continuous possession of the premises since about February or March, 1899; that they have inclosed the same, farmed them either by themselves or by tenants every year, and, finally, that in 1913, shortly before the accidental death of her father, they built a small house and shed thereon. It is agreed, also that the plaintiffs have paid the taxes on the property every year since 1899. They base the title of Violet Parker on a parol gift of the land made to her by her father in the early spring of 1899, coupled with her entry thereupon in pursuance of the gift, and continuous adverse holding of the same until the present time. The only writing involved is a letter written by L. S. Kelsey to the plaintiff Violet some time in February

or March, 1899, and delivered to her by her sister at the direction of the writer. It is here set out:

"Violet—Dear Daughter:

"If Harry [husband] wants to go farming, I will make you a present of the forty acres of land that I bought of Will Tanner, and if that is not enough, I will rent him some more land, but I think he had better run the post office this summer—as you would have to build a house on the land and fix it up.

"Your Loving F. [Father],<br>"L. S. KELSEY."

The plaintiff Violet testified:

"Well, I accepted the land in 1899 when my father gave it to me, and in 1900 I fenced—put a partition fence between his place and mine, his 40 acres joining and mine."

She stated that she and her husband farmed the land, kept up the ditches and fences, and in the spring of 1913 built a house and shed upon it; that she never paid any rent for it, but leased it to others part of the time, and otherwise she and her husband cultivated it themselves, using the crops and the rents for their own purposes; and that her father never claimed the land from her.

Laura Goff, her full sister, testified:

"Why my father always said that it was my sister's land; that he gave it to her, and he would be willing at any time to give a deed, if my stepmother would sign it, but he said she never would talk about signing it. He says, 'The land is hers, and it is hers while I live,' and he says, 'I will fix it when I die, that it will be hers afterward.' 'Why,' he says, 'she don't need to worry about a deed at all, because,' he said, 'the land will be always hers.' "

Lane Goff, the husband of Laura Goff, deposed that he contemplated buying the tract and inquiring of

Kelsey asked if it would be possible for him (Goff) to get the title to the land if he bought it, and he goes on to say (speaking of Kelsey) :

"And he said that he could not give any better title than she had [referring to Violet] ; that his wife refused to give a deed. And he says : 'Well, it is her land and doesn't belong to me.' He says, 'It is her land, and belongs to her while I live, and when I die I will fix it so it will be hers then [meaning Violet].' "

Goff also narrated as a witness that he contemplated running a ditch to his own land situated below the premises in question, and that Kelsey told him he could survey a ditch through on his land, but that when he made the survey he found that a ditch there would not accomplish his purpose. In another interview with Kelsey, as the witness states :

"He says, 'You had better go and see Violet, and see if you can get a right of way through her, and that will put your ditch high enough, so you can get over the hill, or the place you want to get over'—a low place in the hill. And so I did. I went up and saw Mrs. Parker, and arranged with her for a right of way for the ditch, which she gave me, and I drew up a contract, and paid her for the right of way; gave her $50 for the right of way for the ditch."

Ed Carnes applied to Mr. Kelsey to lease the tract in question and another 40 immediately east of the same. Speaking of Kelsey, the witness says :

"And I went to him and I wanted to rent the land, and he says : 'I'll rent you my part of it, and you will have to see Mr. Parker. I give that to my daughter.' He says, 'You can rent it from him, I think.' And I saw Mr. Parker and rented it, and also Mr. Kelsey's."

George Carnes went to Kelsey and tried to buy four acres in the southwest corner of the disputed tract. He imputes this language to Kelsey :

" 'Well, I don't know, George.' * * He studied a little while, and he says, 'No, I can't sell it because I deeded it to Violet Parker.' And he says, 'You go to her, and if she wants to sell four acres, it is all right with me.' "

Grant Dalton owned an irrigation ditch crossing the tract. He says that Mr. Kelsey told him that Mrs. Parker was going to shut the water off if he did not put in the boxes and fix the bridges up on the land. He said that Mrs. Parker owned it, and that she was going to shut the water off if he did not fix the hog gaps and the bridge. H. A. Monday says he sought to buy the land of Kelsey in March or April, 1913, and that the latter replied that he could not sell it to him; that he gave it to Violet when she was married. In 1907 or 1908 Sam Carnes applied to Mr. Kelsey to buy the land, but was informed by him that it belonged to the Parkers. C. Olsen testified that he was employed by the Parkers about 1899 or 1890 in putting in crops on the land; that during the time he was at work Kelsey came to him and told him that he had given that 40-acre tract to his daughter, Mrs. Parker. Chris Peterson applied to Kelsey for leave to conduct an irrigation ditch through the premises, but was referred by him to Mrs. Parker. The testimony for the defendants, who have appeared in the case, comes entirely from the widow and her children by Kelsey's second marriage and the husband of one of her daughters. Charles Hutchinson, the son-in-law, testified, in substance, that some of the daughters by the second marriage reported to Kelsey that Violet had made a claim that she could hold the land by virtue of a tax title, and that after consulting an attorney her father made the statement that she could not hold the land by tax title or any other way; further,

that somewhere about 1910 Kelsey said that he himself would put in the claim for water on the land to be adjusted by the water board; and, lastly, that some time in 1912 Kelsey said to his wife: "Dearie, your head was level when you would not sign that deed." Mrs. Kelsey says that in 1899 she had a conversation with her husband about the land. She goes on to state:

"I asked Mr. Kelsey if he meant to deed the land, and he said, 'Yes.' I said, 'You can't do that, because I won't sign the deed.' He says: 'Oh, yes; we will give them the land.' And I said, 'In justice to them all, you have—' " (interruption by counsel). And she continued: "That he would have to give them all 40 acres of ground, and I said, 'If you do that, with the large family we have, you and I will be in the poorhouse.' * * He said, 'Well, we will let them have the use of the land until they get started.' Presumably they never got started."

She reported that, when Mr. Kelsey came home from putting in the claim for the water right before the water board, he said:

" 'That shyster was there to put in a claim for that land.' I says, 'Did you allow him to do so?' He says: 'No, I didn't; I told him I would tend to my own water rights.' "

She also said that about the year 1910 her husband said that they (referring to the Parkers) did not own the land; that he would take care of the ditch rights, would enlarge the ditch if he wanted to; and that it would be a joke to pay damages through his own land. Again, she makes this statement in answer to a question about what Kelsey said concerning his intentions:

"Well, there was one day we were riding by the premises in question, and he called my attention to

the poor crop on the ground, and he said, 'I have a notion to sell the land,' as someone had wanted to buy it of him, and he said, 'It is practically cut off from what we already own, as we have sold Luther, and, for all Mr. Parker gets out of it, it doesn't make him much good.' I says, 'There would be a powwow in the Parker family if you speak about selling it,' and he says, 'I guess I will do as I choose. They don't own it yet.' He says, 'If we don't sell it, Violet can take it as her share when it comes to a settlement.' "

Maud Hutchinson, a married daughter, of the second group of children, testified about telling her father that Mrs. Parker had said:

"When Luther gets his breaking done, I'll swing my fence around it and take it in."

And that her father said:

"Violet had better be satisfied with what she is getting out of the land. If she gets too smart, she won't get that."

She says that Mr. Goff told Kelsey that Parker wanted some damages for enlarging the irrigation ditch across the premises, and that her father replied, "You don't have to pay any damages." And he said, "I own the land." Other members of the second set of children narrate their concurring versions of these different occurrences mentioned in the testimony for the defendants. Ethel Forsstrom speaks thus of what her father said:

"Well, when Mr. and Mrs. Parker were first married, his intention was to give them the land, and mother would never sign the deed, and later years I have heard him say he was thankful that she never signed the deed to the land; that, if she had of, he would have trouble getting his ditches through; otherwise the land belonged to him and he could do as he liked."

The fact that Kelsey had two sets of children and a second wife gives a pronounced coloring to the whole transaction and largely explains his statements to his wife and the younger members of the family. The testimony for the plaintiff comes mostly from disinterested witnesses. On the other hand, whatever effect may be given to it, the evidence for the defendants is from sources directly interested in the result. The fact stands undisputed that the plaintiffs have been in continuous possession of the property since 1899; that they have inclosed it, separating it from the lands of Kelsey; that they have paid the taxes on it continuously; that they have cropped it every year, either in person or by their tenants, and have never paid any rent.

1. The preponderance of the testimony is to the effect that Kelsey did everything he could to effect a gift of the property to his daughter by the first wife except to actually make a conveyance of the same, and this he would have done but for the fact that his wife refused to sign the deed. From her own lips come the expressions of his intention to give the land to the plaintiff Violet. This also is indicated by the statement of Mrs. Forsstrom. The very capable circuit judge who heard and saw the witnesses had far better opportunity to estimate the effect and value of the testimony or their statements than we who have only the paper recital before us. A careful reading of the entire record convinces us that his conclusion on the facts was right.

2. It is unquestioned that the mere parol gift of realty will not of itself pass title; for it is said in Section 804, L. O. L.:

"No estate or interest in real property, other than a lease for a term not exceeding one year, nor any

trust or power concerning such property, can be created, transferred, or declared otherwise than by operation of law, or by a conveyance or other instrument in writing, subscribed by the party creating, transferring, or declaring the same, or by his lawful agent, under written authority, and executed with such formalities as are required by law.''

3. On the other hand, it is a rule of property in this state that continuous adverse possession of land for ten years under a claim of title is sufficient to pass to the possessor the fee-simple estate. This effect is worked out by ''operation of law'' in harmony with the language of the statute just quoted: *Caufield* v. *Clark,* 17 Or. 473 (21 Pac. 443, 11 Am. St. Rep. 845); *Dunnigan* v. *Wood,* 58 Or. 119 (112 Pac. 531); *Stout* v. *Michelbook,* 58 Or. 372 (114 Pac. 929); *Parker* v. *Wolf,* 69 Or. 446 (138 Pac. 463).

4. The pivotal point in this case is whether a parol gift of the land is sufficient to inaugurate adverse possession. The rule is stated thus in 2 C. J., p. 150, § 267:

''Possession of land by a donee under a mere parol gift, accompanied with a claim of right, is adverse as against the donor, and if continued without interruption for the statutory period is protected by the statute of limitations and matures into a good title. The statute of frauds does not prevent one from entering and claiming under a parol gift and acquiring title by adverse possession. That such a parol gift conveys no title and operates only as a mere tenancy at will capable of revocation or disaffirmance by the donor at any time before the bar is complete is immaterial; it is evidence of the beginning of an adverse possession by the donee which can be repelled only by showing a subsequent recognition of the donor's superior title, or by the donor reclaiming or reasserting his title. * * ''

The following precedents teach the doctrine enunciated in the text quoted: *Lee* v. *Thompson,* 99 Ala 95 (11 South. 672); *New Haven Trust Co.* v. *Camp,* 83 Conn. 360 (76 Atl. 1100); *Studstill* v. *Wilcox,* 94 Ga. 690 (20 S. E. 120); *Stewart* v. *Duffy,* 116 Ill. 47 (6 N. E. 424); *Wilson* v. *Campbell,* 119 Ind. 286 (21 N. E. 893); *Albright* v. *Albright,* 153 Iowa, 397 (133 N. W. 737); *Delano* v. *Air,* 157 Ky. 369 (163 S. W. 216); *Wheeler* v. *Laird,* 147 Mass. 421 (18 N. E. 212); *In re St. Louis Register Title,* 125 Minn. 484 (147 N. W. 655); *Davis* v. *Davis,* 68 Miss. 478 (10 South. 70); *Allen* v. *Mansfield,* 108 Mo. 343 (18 S. W. 901); *Tippenhauer* v. *Tippenhauer,* 158 Ky. 639 (166 S. W. 225).

Although he knew the plaintiffs were claiming title and were exercising notorious acts of ownership over the property, he took no steps whatever to rescind his gift. His statements to his wife and members of his younger family are not shown to have been brought to the attention of the plaintiffs, and would not constitute a rescission of the gift. They have a strong flavor of being made to placate the wife and her children and amounted to mere bluff. He never did nor said anything to the plaintiffs indicating any intention to carry into effect what he is reported by the defendants' witnesses to have said on the subject. It is not necessary to constitute adverse possession that it should have begun in an act of hostility against the former owner. By his own doing he may give impulse to that condition. Indeed, when a man of his own free will conveys land to another, he himself starts the condition of adverse claim in favor of the other party.

5. The decree quieted the title of the plaintiff Violet Parker only to what land was within her inclosure. This was correct, for, without any instrument contain-

ing words of present grant indicating the exact termini of the holding, the plaintiffs were without the conventional color of title to support their claim to anything more than that which they actually occupied. Besides this, they have not appealed from the decision of the Circuit Court. There is no error in the record either of fact or of law.

The decree is affirmed.     AFFIRMED.