Argued 12 February; decided 9 April, 1900.

## SLATER *v.* REED.

[60 Pac. 709.]

QUIETING TITLE—ACTS DENOTING POSSESSION.*

1. The act of the person occupying a tract of farm land in taking a mortgagee into the inclosure and saying that he could take possession without making any reservation or condition vests the mortgagee with a possession sufficient to maintain a suit to quiet title.

ACTS NOT CONSTITUTING AN OUSTER OF POSSESSION.

2. Possession of real property is not ousted by an adverse claimant coming on the premises, nailing up the buildings, and instructing the tenant in possession not to enter the buildings, when such claimant did not remain on the premises or put any one in possession.

ACTS CONSTITUTING ADVERSE POSSESSION.

3. Plaintiff's grantors had occupied the premises in controversy for fourteen years. They had the property insured as their property, and had erected buildings thereon, which could equally as well have been erected on other lots, where the title was unquestioned. Defendant claimed under a deed executed by one who owned the property prior to plaintiff's grantors. Plaintiff's grantors testified that they had expected to find a superior title to the property, but that they would not have given up the property unless a superior title was shown. *Held* sufficient to show adverse possession by plaintiff's grantors.

From Polk : HENRY H. HEWITT, Judge.

This suit was originally commenced by H. P. McNary, as receiver of the Williams & England Banking Co. against J. J. Reed, to remove a cloud from the title to certain town lots. The present plaintiff, Woodson T. Slater, was substituted for McNary during the progress of the suit. Defendant appeals from the decree.

AFFIRMED.

---

*NOTE.—This suit was instituted in 1897, under Section 504, Hill's Ann. Laws, providing that "Any person in possession by himself or his tenant of real property may maintain a suit in equity against another who claims an estate or interest therein adverse to him, for the purpose of determining such claim, estate or interest." The amendment of 1899 had not then been passed, and the decision is made with reference to the old law.—REPORTER.

For appellant there was a brief and an oral argument by *Mr. Geo. G. Bingham.*

For respondent there was a brief over the names of *W. T. Slater* and *W. M. Kaiser,* with an oral argument by *Mr. Slater, in pro. per.*

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

·This is a suit to remove a cloud from the title to lots 1, 2 and 4, in block 7, Town of Eola, Polk County, Oregon. The plaintiff deraigns title from one William Duran and Jane C. Duran, his wife, who conveyed them by warranty deed to Thomas J. Riggs, September 22, 1855. Riggs having died, his heirs, conveyed them to Williams, England & Co., as mortgagees, for the use and benefit of O. J. Beardsley, with the condition that the deed therefor should be held as a mortgage to secure the payment of the purchase price thereof, and for other funds advanced and to be advanced by said Williams, England & Co. for her use and benefit. By due assignments and transfers subsequently made, the Williams & England Banking Co. became the owner of all the interest of Williams, England & Co. in and to said mortgage and premises. The property of the banking company having gone into the hands of a receiver, a suit was instituted, and on the —— day of June, 1896, a decree rendered foreclosing said mortgage, and directing the premises in controversy to be sold, with other lands, to satisfy said indebtedness of O. J. Beardsley to the receiver. There was no sale under the decree, but O. J. Beardsley and her husband, O. P. Beardsley, executed to said receiver a confirmatory deed, for the consideration of $12,000, to the premises in dispute, and other lands therein described. It is alleged that plaintiff and his grantors have been in adverse possession of the lots since the twenty-second day of Septem-

ber, 1855, and that the defendant claims under a quitclaim deed from William and Jane C. Duran, his wife, to one Alvin C. R. Shaw, executed September 3, 1855. Shaw and wife deeded to Joseph W. Downer, Edward Steelman, and Robert Combs, by warranty, November 7, 1858 ; Steelman and Combs to Downer, April 23, 1860 ; and Downer to the defendants, May 22, 1896. Duran's deed to Shaw does not appear to have been recorded.

Three questions are presented : (1) Was plaintiff in possession at the time of the institution of this suit? (2) Have he and his grantors been in the adverse possession for more than ten years, it being conceded that defendant has the better paper title? (3) Did the said grantors intend that the premises in dispute should be included in the confirmatory deed?

1. It is an admitted fact that Mrs. O. J. Beardsley was in possession of the lots in dispute at the time of the execution of the confirmatory deed. Mr. H. P. McNary relates that while the suit for the appointment of a receiver was pending, and before a decree was rendered therein, he drove out to the place for the purpose of taking possession ; that Mrs. Beardsley went with him to the different pieces of property, and put him into full possession thereof. In order to appreciate the manner in which possession was taken, a description of the premises should be given. There are situated upon the lots in question two hop houses, used for curing and drying hops,—one upon lot No. 1, and the other upon lot No. 4. A short distance to the east or southeast of these stands a third, but not upon the disputed lots. All of these houses were, and had been ever since their construction, used in connection with the hop yard located approximate thereto. The lots, hop yard and other lands were all contained in one inclosure. After relating that Mrs. Beardsley took him upon the different pieces of property,

he further states that she took him into the field where
those houses were located,—rather to the east of them,—
and turned over the whole of the property to him, mak-
ing no reservation of any kind.   It is significant that
the bank was taking possession through Mr. McNary as
mortgagee, and  Mr. and Mrs. Beardsley were delivering
the premises covered by the mortgage.   The event oc-
curred before the foreclosure suit had been instituted, and
it is very natural to suppose that, without some express
reservation, she intended to deliver the whole of the
premises, including the hop houses.   The claim that the
house situated off of the premises in dispute went with
the delivery is not controverted, and, if that passed, the
others undoubtedly did by the same act.

2.    The bank therefore obtained and continued in pos-
session unless it was ousted by the act of defendant Reed.
All the evidence touching such action is that given by
Mr. Slater, who is now the receiver of the bank.   When
relating a conversation that occurred between him, Reed
and the Beardsleys, touching the houses in dispute, he
says, among other things, that "Mr. Reed had previously
been down to the hop houses, and had nailed them up,
and had forbidden our tenants to enter them."   Reed
had put no one in possession of the property, nor did he
remain there personally.   It can hardly be said that such
exercise of possession constituted an ouster of the plain-
tiff, so as to displace his possession of the premises in
dispute.   But, were it otherwise, the pleadings admit
the plaintiff's possession.   The complaint contains this
allegation : "That this plaintiff has leased said premises,
including the said hop yard and hop houses, to W. H.
Holmes and Aleck Holmes, who are now in the posses-
sion of said premises."   This is not denied.   Again it is
alleged "that the present right to the possession of said
premises, and the present possession thereof, are in the

said tenants of plaintiff," etc. This is partially denied, in the following language: "Denies that the present right to the possession of said lots 1, 2 and 4 in said block 7 is, or has at any time been, in the tenants of plaintiff, or any part thereof." Here is enough to show that there was no intention of disputing the actual possession, and that it was only the right thereto which was drawn in question.

3. The next controversy is regarding the adverse holding. It will be unnecessary to refer to a date anterior to the deed from the Riggs heirs to Williams, England & Co. This deed was executed January 4, 1882. At that time Mrs. Beardsley went into possession of the premises in controversy, and about this there is no dispute. She inclosed them shortly after by building a fence around them, including the other premises. In 1883 she constructed the hop house on lot No. 1, and in 1885 the one upon lot No. 4, and used and maintained these houses thereafter up to the time of delivery of possession to the bank, in connection with her hop yard, in drying and curing hops produced upon the premises each and every year. That the possession was continuous is not questioned. But it is asserted with much confidence that Mrs. Beardsley's possession was not under claim of right or title, but that she held merely in subordination to the true title. Mr. Beardsley testifies that they took chances of building on the lots, and that, if it had turned out that they belonged to some one else, then that they would have had to buy them; that he did not know Duran had deeded the lots until when he was assisting Mr. Slater in preparing the complaint for the foreclosure; that he knew prior to this that Shaw had deeded the lots, but did not know that he had any deed himself; that he understood the deed covered these lots by the general description, but not by specific designation. He was then interrogated

as follows : "Q. Then you took possession of it, and intended to hold it until some one could prove to you a better title. Is not that a fact ? A. Well, I don't know. Why, I guess, perhaps, that would be what it meant. Q. You did not intend to surrender these lots just because they said they owned them ? A. No ; they would have to show title. Q. Then, as far as any other person was concerned, you claimed to own them until another person would show a better title ? A. I did not claim to own them." Mrs. Beardsley testified in answer to the following questions : "Q. Did you claim possession of these lots as your own at the time you bought them ? A. We could not find as they were ours. We could not find who the owner was, and we wanted to build the houses on this place, and we run the risk of finding the owner of them. Q. Were you claiming these lots by virtue of having been in possession of them for a long time at the time that you made this deed ? A. No, sir. Q. I will ask you this : If at any time you have claimed these lots by virtue of your right of possession ? A. No, sir." On cross-examination : "Q. Mrs. Beardsley, at the time you bought these lots and property from Mr. Riggs, you intended to claim all that would be covered by his deed, did you not ? A. All we thought we owned by reason of the deed, we intended to claim. Q. Did you ever know that any other person ever claimed this land ? A. No ; we did not know. We could not find out. We could not trace it. Q. But you had possession of them all this time ? A. Well, yes, in a way. We were using them. We fenced them in. Q. Was it your intention to surrender them ? A. We would have it to do. We expected to buy them when we found the person who owned them. Q. You did not intend to rely entirely upon Riggs' deed as a title ? A. No, sir ; we could not trace the title. Q. Well, now, as a matter of fact, didn't you

intend to hold these lots against the whole world until some one could prove a better title ? A. Yes, sir; in a way. If some one came with a better title, we expected to buy it; but, of course, if our title was best, we would not have to buy them."

Over against this testimony, it appears that Mrs. Beardsley, through her husband, who acted as her agent in the transaction of much of, if not all, her business in connection with the property, had these houses insured from year to year, making the loss, if any, payable to Williams & England Banking Co. as its interest might appear. In the application for such insurance she represented that the property was covered by this mortgage; that she was the sole and undisputed owner of the land and property to be insured, and that the title was in her name; that she enjoyed the property, and had a bond for a deed; and that the property was occupied by the owner. These houses were built at an expense of about $500 each, a portion of the money being advanced by the banking company for the purpose; and they were constructed upon these lots, when it would have been just as convenient to have constructed them on the adjoining land. In these acts there was not only an exercise of absolute ownership, but an assertion of absolute title under the deed held by the banking company for her use and benefit. The defendant is the son-in-law of the Beardsleys, and it is a significant fact that he did not procure this deed until he had been informed by Beardsley that there was a prior outstanding deed, which information the latter had obtained from Mr. Slater while he was preparing the complaint for foreclosure proceedings; and it is quite probable that, if it had not been for this disclosure, Reed would never have procured the deed under which he claims title. So that there is a strong motive present for the Beardsleys now to disclaim any ownership of these

lots while in the possession and exercising dominion over them. Their testimony is equivocal, and not consistent with their previous acts and pretensions, and impresses us as being much less convincing. The acts of these parties are more potent than words. When the attending circumstances and the manner in which they used and employed this property for more than fourteen years are considered, it is difficult to believe that they were not also claiming the title absolutely as against the world, and the weight of evidence adduced discredits such disclaimer.

There is some contention that the plaintiff recognized the defendant's title by offering to rent the houses from him. But plaintiff had no such purpose. There was an attempt on his part to obtain defendant's consent to the use of the houses by the tenants pending a settlement of the dispute, under a proviso that whatever arrangement was then made or entered into in that particular was not to impair the rights of either party to the controversy in the meanwhile. The arrangement was not agreed to, and the negotiations did not amount to an acknowledgment of Reed's title.

We come now to the last question, which is not difficult of solution. While Mr. Slater was preparing the complaint for the foreclosure, he became cognizant of an outstanding deed to Shaw, and that he had conveyed it to Downer and others; and, having consulted with Beardsley touching the matter, the latter became cognizant of the fact, also. The complaint comprised in its general description of the premises the lots in dispute, but did not designate them specifically. The decree, however, went further, and specified in the description "all of block seven." The confirmatory deed was prepared in July, 1896, by Mr. Slater, the bank's attorney, but was not executed by the Beardsleys until November 13, 1896. Mr. and Mrs. Beardsley both testify that they

did not read, or have an opportunity to read, the deed, but relied upón Mr. Slater's representation that it contained the same description that was contained in the complaint; therefore, that they did not agree or undertake to convey the lots in question. Mr. Slater testifies that Mr. Beardsley read the deed very carefully, and understood the description contained therein. But, whatever may be the fact in this respect, it is clear that the description contained in the complaint was ample and sufficient to carry the title to these lots, and included them within the designated boundaries. So that, in whatever sense they may have understood the description placed in the deed, in either event the title to the lots would have been carried under the deed. These considerations affirm the decree of the court below, and it is so ordered. AFFIRMED.