Argued June 7, reversed with directions October 25, 1961,
petition for rehearing denied January 31, 1962

## ROHNER ET UX *v.* NEVILLE

365 P. 2d 614
368 P. 2d 391

*H. M. Weatherford,* Albany, argued the cause for appellants. On the briefs were Weatherford & Thompson, Albany.

*Robert Mix,* Corvallis, argued the cause and filed a brief for respondent.

Before McAllister, Chief Justice, and Rossman, Perry, Goodwin and Lusk, Justices.

GOODWIN, J.

Plaintiffs Rohner appeal from a decree denying their suit to quiet title to 51.9 acres of land. After trial, the court dismissed the suit because the complaint did not allege that the defendant was claiming an interest adverse to the plaintiffs. Such an allegation is required by ORS 105.605. *Fildew v. Milner,* 57 Or 16, 20, 109 P 1092. It does not follow, however, that the suit was properly dismissed.

██ There was no demurrer. In the absence of a timely demurrer, a pleading is to be construed liberally in favor of the pleader. *Hill v. G & W Development Corp.,* 228 Or 93, 363 P2d 763. Thus construed, the allegations that the defendant Neville claimed title to the land and was interfering with the possession of the plaintiffs support an inference that the defendant claims an adverse interest in the disputed land. See *Fildew v. Milner,* supra, 57 Or at 20. The trial court should have decided the case on the merits. By making a complete record, however, the trial court makes it possible for us to dispose of the suit without a further trial.

The Rohners purchased the land from one Ayers after the Willamette River cut a new channel and separated the land from the Ayers farm in Benton County. The same change of channel made the land contiguous to the farms of Rohner and Neville in Linn County. Figures 1, 2, and 3 on the accompanying sketch show the various routes taken by the Wil-

lamette River in modern times. It will be seen that in the original survey of 1854 the river was the boundary between Lots 5 and 7. The record tends to prove that the river followed the route shown in Figure 1 from 1854 until about the end of the Nineteenth Century. Some time before 1921, the exact year being immaterial for the purposes of this case, the river left its old channel to follow the route shown schematically in Figure 2. The condition at the time of trial is represented by Figure 3. This channel resulted from a breakthrough in 1950.

■ The documentary evidence as well as the testimony of engineers and lay witnesses reveals that the river during recorded history has been given to sudden and violent changes of channel. Witnesses described the various cut banks left by past changes in the channel. Some of these cuts range from 4 to 21 feet in height. The field in the middle of the disputed land is virtually a continuation of the fields lying across the river. Old surveys show substantial changes in the channel which could have been made only as the result of the cutting action of flood waters. Other than the presumption of gradual change which counsel mentioned in their briefs and arguments,[1] there was no evidence that any substantial change in the channel of the river after 1854 occurred by reason of the gradual deposit of soil against Lot 7. On the contrary, the evidence indicates that the only changes in the channel of consequence in this case were avulsive. It follows that the record title to land resected by the river follows the boundaries established by the official survey rather than the migratory channel of the river. Accordingly,

---

[1] See Wyckoff et al. v. Mayfield, 130 Or 687, 691, 280 P 340. Accretion is defined in Katz v. Patterson et al., 135 Or 449, 452, 296 P 54 [quoting 1 RCL 226, Accretion § 1 (1914)], as the gradual deposit of waterborne solids on the banks of a body of water.

Lots 4, 5, 6 and 7 retain their original boundaries. *Hirt v. Entus,* 37 Wash2d 418, 224 P2d 620; *Brown v. Wilson,* 348 Mo 658, 155 SW2d 176; 4 Tiffany, The Law of Real Property (3d ed, 1939) § 1222. For a recent discussion of accretion, see Annotation, 54 ALR2d 643. This being the case, Neville retains record title to the disputed portions of Lots 4 and 6 no matter how these lots may have been sectioned by the movements of the river.

The principal issue is whether the Rohners can show an interest superior to the paper title of Neville in those portions of Lots 4 and 6 which they now claim. The Rohners alleged in their complaint that they are the owners of the disputed land by reason of the adverse possession thereof by their predecessors in title. We must now examine that contention.

From a date prior to 1921, and until 1950, the location of the Willamette River was that schematically presented in Figure 2. Thus, it can be seen that for many years before 1950 the disputed land was contiguous with Lot 7 on the left, or west, bank of the river. During the same period, the land was cut off from and was not used by the owners of Lots 4 and 6. In 1932, Lot 7 was conveyed to one Chilcote, and shortly thereafter an undivided half was conveyed to one Davis. We will refer to this ownership as the Chilcote-Davis interest. Chilcote and Davis had record title to all material parts of Lot 7 from 1932 until 1951.

■ The Rohners' evidence shows that Chilcote and Davis, while owners of Lot 7, farmed parts of the disputed land, used a portion for grazing, built roads to it, and otherwise made regular use of the property all of which was open, notorious, and hostile to any

Figure 1
Survey 1854

Figure 2
Channel Prior To 1950 Flood

Figure 3
Present Channel-Shaded Area in Dispute

claim of right in any other person. *Springer v. Durrette et ux,* 217 Or 196, 342 P2d 132. We find that the rights of Neville in the disputed lands were fully extinguished as against the Chilcote-Davis interest by the running of the prescriptive period.

It follows that Chilcote and Davis acquired a good title to the disputed land and were the owners thereof prior to their deed of 1951. They could have conveyed this land to Ayers in the same deed employed to convey "Lot 7". In 1951, after the Willamette River had cut off the ox-bow which contained the disputed land and the river channel was as depicted in Figure 3, Chilcote and Davis conveyed "Lot 7" to Mrs. Chilcote's cousin, Ayers. No part of Lots 4 or 6 were described in the deed. In his testimony, Ayers stated that he believed that he was acquiring from Chilcote-Davis not only all of Lot 7 as surveyed in 1854, but also all the land now in question, which Ayers said he thought was encompassed by the description "Lot 7". We do not have direct evidence as to the intent of the Chilcote-Davis grantors. There is, however, circumstantial evidence that the Chilcote-Davis grantors intended to convey the disputed tract to Ayers. As noted above, they had always treated the ox-bow as part of their land and all the property as a single tract. The tax records would seem to indicate that the Chilcote-Davis grantors believed that this single tract to which they laid claim was encompassed in the description of "Lot 7". Furthermore, they began farming this land under a deed of "Lot 7". Ayers had labored upon the disputed tract and considered it part of "Lot 7". His grantors knew that he had worked the land as a single tract. From these facts we may infer that the Chilcote-Davis grantors intended to convey the property in question when they

deeded "Lot 7" to Ayers. No evidence was offered in support of a contrary inference. In 1954, Ayers conveyed "Lot 7" to Mr. Rohner, excepting, however, portions thereof remaining on Ayers' side of the river. There is no doubt that Ayers intended to convey and Rohner to acquire the land in question, since Ayers and Rohner together went on the land and measured it.

The deeds from Chilcote and Davis to Ayers and from Ayers to Rohner, by omitting a description of the disputed land, failed to correspond to the understanding of the parties. If this were a dispute between Rohner and Ayers, or between Ayers and the Chilcote-Davis interests, reformation of their respective conveyances might well be available. *O'Brien et al v. Michels et ux,* 222 Or 399, 352 P2d 735; *Zink et ux v. Davis et ux,* 203 Or 49, 277 P2d 1007; *Ramsey v. Loomis,* 6 Or 367 (1877). Reformation, of course, is out of the question here because the necessary parties have not been joined, but this does not mean that the court may not decide the rights of the parties before it. The Rohners have an equitable claim derived from the possessory rights of their predecessors, and it is this interest which we must weigh against the defendant's paper title.

▪ Plaintiffs in a quiet-title suit need not show that their title is good as against all the world; rather they meet their burden of proof when they show a title which is superior to that of the defendant who has asserted an adverse claim. *Slater v. Reed,* 37 Or 274, 60 P 709. Courts have frequently said that a plaintiff must prevail on the strength of his own title rather than upon the weaknesses of the defendant's title. See, e.g., *Hogue v. Bourgois,* 71 NW2d 47, 54 ALR2d 633, 641 (ND 1955). This general proposi-

tion is found in our own cases, e.g., *Jones et al. v. Jackson et al.,* 195 Or 643, 659, 246 P2d 546, but it does not require the plaintiff's title to be above reproach. Indeed, even before the time has run as against the true owner, the possessor has an interest which the law will protect as against all others. In actions at law we have said, "In this state the rule is fixed that bare possession is a sufficient interest in land to enable one ousted therefrom to eject a trespasser or one unable to show a better title. *Kingsley v. United Rys. Co.,* 66 Or 50, 55, 133 P 785, and cases there cited; *Feehely v. Rogers,* 159 Or 361, 376, [76 P2d 287,] 80 P2d 717." *Inman et al v. Ollson et al,* 213 Or 56, 66, 321 P2d 1043.

■ The common-law rule, as stated in *Asher v. Whitlock,* LR 1 QB 1, 5 (1865), by Cockburn, C.J., "possession is good title against all but the true owner * * *," has long been the rule in America. See, e.g., *Hubbard v. Little & others,* 63 Mass (9 Cush) 475; 3 Casner, American Law of Property 759, § 15.2. Cases are collected in the Note, 46 LRA(ns) 487.

■ Likewise in suits to quiet title it is clear that the plaintiff need not have good paper title. E.g., *Ladd v. Mills,* 44 Or 224, 75 P 141 (suit by administrator). While unlawful possession is not enough, *Tichenor v. Knapp,* 6 Or 205 (1876), the plaintiff need only have a "substantial interest in or claim to the property." *Ladd v. Mills,* supra, at 226. We have affirmed a decree in favor of a plaintiff who had only a claim based on a bond giving him a right to redeem. *Holmes v. Wolfard,* 47 Or 93, 81 P 819. Further, this court has affirmed the right of a plaintiff under an equitable estoppel against a defendant who admittedly held good legal title. *Mascall v. Murray,* 76 Or 637, 149 P

517. See also *Gilkey v. Murray,* 76 Or 653, 149 P 521.
It is apparent, then, that in a suit to quiet title under
ORS 105.605 a plaintiff must prove that he has some
substantial interest in the land and that his title is
better than that of the defendants. Once a plaintiff
has proved this much, he has made out a *prima facie*
case for relief insofar as this phase of his case is
concerned.

■ The defendant has cited *DuVal et ux v. Miller,*
208 Or 176, 300 P2d 416, for the proposition that the
plaintiffs can not avail themselves of the rights of
their predecessors without a description of the dis-
puted land in their deed. The above-cited decision
and the earlier opinion of this court in related litiga-
tion, *DuVal v. Miller,* 183 Or 287, 192 P2d 249, re-
hearing denied 183 Or 293, 192 P2d 992, contain
language which, standing alone, may tend to support
the defendant's contention. The claim of the plain-
tiffs in the *DuVal* litigation, as here, rested upon the
adverse possession of their predecessors who had
possessed the disputed tract for the statutory period.
The conveyance from their predecessors to the plain-
tiffs was by metes and bounds and did not include
the tract in question. This court held in the first suit,
which was to quiet title, that whatever may have been
the rights of their predecessors to the disputed lands,
the plaintiffs could not prevail under them because
they had failed to show that they had acquired their
predecessors' rights. The case turned on a failure of
proof. Thus, the first *DuVal* decision does not apply
to the present controversy, in which we have found
that the plaintiffs were in possession under an equit-
able right to the interests acquired by their predeces-
sors in title. The defendant, on the other hand, has
lost his rights in the land as against those predeces-

sors, by their adverse possession. The defendant thus had no title at all. The *dictum* in the second *DuVal* decision, upon which the defendants rely for the proposition that the plaintiffs could not have acquired their grantors' interest without a deed, has no application to the case at bar. As we have seen, the defendant has no standing to challenge the defects, if any, in the title of the plaintiffs.

The plaintiffs in the case at bar have possession plus an equitable interest in the disputed land. In one respect the case at bar resembles the *DuVal* cases, supra, in that the instant case does not involve tacking. Chilcote-Davis obtained title to the land by adverse possession. Their title was good against all the world. *Percival v. Chase,* 182 Mass 371, 376, 65 NE 800. They intended and attempted to convey to Ayers, who in turn intended and attempted to convey that land to the Rohners. Ayers put Rohner in possession. Either lawful possession or the equitable claim Rohner has against his grantors would be a sufficient interest upon which to bring this suit.

■ Only the defendant, whose interest has been weighed and found wanting, is concluded by this decree. *Elwert v. Reid,* 70 Or 318, 325, 328-29, 139 P 918, 141 P 540 (on rehearing). We do not attempt to decide the rights of possible parties who are not before the court.

Other grounds for relief were tendered by the plaintiffs in the briefs and arguments, but need not be considered in view of our disposition of the suit.

The decree of the court below is reversed. The suit is remanded to the circuit court with instructions to enter a decree for plaintiffs quieting title to the disputed land against any claim by the defendants.

Neither party to recover costs.

## ON PETITION FOR REHEARING

Robert Mix, Corvallis, for the petition.
Weatherford & Thompson, Albany, contra.

GOODWIN, J.

In a petition for rehearing, the defendant contends that we erred in upholding the plaintiffs' claim of

adverse possession because the disputed lands were registered under the Torrens system, and accordingly were not subject to adverse possession.

The transcript and exhibits reveal that the disputed lands were originally patented in 1864. The first conveyance was recorded in the Linn County deed records in 1872. Thereafter in 1908 a predecessor in title of the defendant registered certain lands under the then new Torrens system of registration, now described in ORS 94.005 to 94.990. The registration purported to include the lands presently in dispute.

ORS 94.220 provides that after land has been registered, no estate or interest therein may be acquired by adverse possession. The defendant contends that this statute automatically defeats the plaintiffs' case without the necessity of considering the evidence.

■ The fatal weakness in the defendant's present argument is that it was never presented in the trial court. There is nothing in the record from which we could make a finding that the disputed lands were not adversely possessed before 1908, in which case they would not have been subject to registration. For all the record shows, the lands presently in dispute could have been acquired by adverse possession at any time prior to 1908 by one of the plaintiffs' predecessors in interest. In our original opinion, there was no need to carry adverse possession further back than the ten years immediately preceding the 1950 flood. There may have been many years of adverse possession prior to the flood.

The record leaves the various positions of the river channel, the possession of the disputed lands, and the geographical relationship thereof to other nearby lands in the realm of speculation. It is just as possible that the disputed lands were being farmed by landowners

on the west, or Benton County, bank of the river in 1908 as by landowners on the east, or Linn County bank. If such were the case, then the Torrens Act would have had no effect on the lands in dispute. The reason the record is in this uncertain condition is that no issue was ever presented to the trial court concerning the effect of ORS 94.220, and accordingly no evidence was taken on the various questions which might have been raised thereby.

The defendant met the plaintiffs' assertion of adverse possession by a denial and by proof of the defendant's paper title. The defendant also introduced evidence attempting to show that the possession by the plaintiffs' predecessors was less than adverse, that it had not existed for the necessary period immediately preceding the filing of the suit, and that the defendant had paid taxes to Linn County. The trial proceeded along the lines indicated by the issues thus made up. It very well may have been possible for the plaintiff to have proved facts showing the geographic relationship of the disputed lands with other relevant lands in 1908 and the possession thereof at all relevant times if the defendant had mentioned his present theory in the trial court.

The defendant's plight illustrates the necessity of presenting one's theory of recovery or defense in the trial court. The failure to raise the Torrens title question below produced a record on appeal which is devoid of useful evidence upon which the statute could be said to be applicable or inapplicable.

We do not consider on appeal contentions which were not presented below. *Broyles v. Northwest Portrait Finishers,* 73 Adv Sh 1039, 229 Or 427, 367 P2d 403; *Warren et ux v. Parsons et ux,* 224 Or 605, 609, 356 P2d 953; *Kuchta v. Western Oldsmobile, Inc.,* 224 Or

50, 56, 355 P2d 458; *Van Natta v. Nys and Erickson et al*, 203 Or 204, 217, 278 P2d 163, 279 P2d 657. *A fortiori*, a point raised for the first time in a petition for rehearing is not timely. *In re Shepherd's Estate*, 152 Or 15, 45, 41 P2d 444, 49 P2d 448.

The petition for rehearing is denied.