Argued and submitted January 8, affirmed October 10, 2001

David L. HINTON
and Patricia D. Hinton,
*Appellants,*

*v.*

Frank HANNIGAN;
Dorothy Hannigan,
aka Dotty Hannigan;
Arkate Group,
acting by and through
Kathleen Whitesell, Ron Du Buc, and Teke Du Buc,
*Respondents.*

98-559; A108340

33 P3d 379

Martin Leuenberger argued the cause and filed the briefs for appellants.

A. J. Schmeits argued the cause for respondents Frank Hannigan and Dorothy Hannigan. With him on the brief was Silven, Schmeits & Vaughan.

No appearance for respondent Arkate Group.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.*

SCHUMAN, J.

---

* Schuman, J., *vice* Linder, J.

## SCHUMAN, J.

Plaintiffs and defendants sought to quiet title to the Pete Mann Ditch.[1] Plaintiffs appealed from a judgment that dismissed their claims and defendants' counterclaims. We review *de novo*, ORS 105.605; ORS 19.415(3); *Nedry v. Morgan*, 284 Or 65, 67 n 1, 584 P2d 1381 (1978), and affirm.[2]

A series of ditches, approximately 30 to 35 miles in length, apparently traverses government and private land and conveys water from Grant County to the lower elevations in Baker County. Each ditch in the series was constructed in the mid-1800s and has been known by at least one name since its construction. These ditches are referred to collectively as the Pete Mann Ditch (the ditch). The water conveyed by the ditch has been essential for commercial mining operations in the area.

Plaintiffs own the patented Winterville Placer Mining Claim (Winterville) located in Baker County. In 1890, the United States issued the patent for Winterville to Peter Mann, Wallace Travillion and Milton Stevens. The patent granted the mining premises,

> "together with all the rights, privileges, immunities and *appurtenances* of whatsoever nature thereunto belonging, unto the said grantees above named and to their heirs and

---

[1] The defendants in this appeal are Frank Hannigan; Dorothy Hannigan, aka Dotty Hannigan; and the Arkate Group, acting by and through Kathleen Whitesell, Ron Du Buc and Teke Du Buc. A brief was filed on behalf of Frank and Dorothy Hannigan. No brief was filed on behalf of the Arkate Group. Pursuant to ORAP 5.60, the case was submitted on the merits as to the Arkate Group. For purposes of this opinion, "defendants" refers to the Hannigans and the Arkate Group. Additionally, we note that, at trial, defendants' attorney stated that defendant "Teke Du Buc is a little dog[.]" According to the parties' attorneys at trial, Teke's name may have appeared on some documents.

[2] In their brief, the Hannigans argue that the trial court had authority to decide the priority of the parties' rights in the ditch and should have quieted title in them because they adversely possessed the ditch or, alternatively, plaintiffs abandoned the ditch. However, even though the Hannigans seek affirmative relief that the trial court did not grant to them in its judgment, they did not cross-appeal. In *Ricciardi v. Frink*, 133 Or App 436, 447, 891 P2d 1336, *rev den* 321 Or 268 (1995), we held that, because the defendant sought "to modify the judgment by obtaining relief the trial court expressly denied, [the] defendant was obliged to file a cross-appeal." Thus, to the extent that the Hannigans' arguments seek affirmative relief that the trial court did not grant, we will not address them.

assigns forever; *subject nevertheless to the following conditions and stipulations*:

"* * * * *

"* * * That the premises hereby conveyed shall be held subject to any vested and accrued water rights for mining, agricultural, manufacturing or other purposes, and *rights to ditches* and reservoirs used in connection with such water rights as may be recognized and acknowledged by the laws, customs and decisions of courts." (Emphasis added.)

The parties stipulated that, in 1973, Anthony Brandenthaler owned the ditch and the mining claims owned by the parties. In 1974, Brandenthaler and his wife conveyed Winterville to Ray-Call, Inc. The deed conveyed Winterville,

"together with all privileges and appurtenances situated thereon or pertaining thereto, but subject to patent reservations and exceptions, mineral reservations on [the Boone Consolidated Quartz Mining Claim], and to existing easements and rights of way for roads, ditches, pipe lines, telephone or power lines and the like, as now located upon or across the said parcels, or evidenced by instruments appearing of record, and to all rights of ingress and egress and other incidental rights and privileges connected therewith."

Thereafter, in 1977, plaintiffs entered into a contract with Ray-Call to purchase Winterville. Although the 1982 deed from Ray-Call to plaintiffs indicated that Winterville was more particularly described in the patent, it did not otherwise expressly convey Winterville together with ditches or appurtenances.

In 1987, after Brandenthaler's death, his widow sold other mining claims to the Hannigans. Brandenthaler's widow conveyed unpatented mining claims, "together with all of the mines and minerals, limestone and other mineral substances therein, and all the rights, privileges and franchises thereunto incident, appendant or appurtenant, or ther[e]with usually had and enjoyed and the issues and profits thereof." Brandenthaler's widow also conveyed patented claims "with the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining." Thereafter, Brandenthaler's widow sent to the United States

Department of Agriculture-Umatilla National Forest a letter that provided, in part, that she "has sold and hereby assigns any and all interest which she may have in the 'Pete Mann Ditch' to" the Hannigans.

In their suit to quiet title, plaintiffs alleged that they owned the ditch and that it was appurtenant to and served Winterville.[3] Defendants denied that plaintiffs owned the ditch and also sought to quiet title to the ditch in themselves based on their counterclaims of abandonment and adverse possession. At trial, plaintiffs asserted that the source of their ditch rights could be found in 43 USC § 661 (1994) (section 661).[4] As pertinent to this case, section 661 provides:

"Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage.

"All patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water

---

[3] We understand that the ditch traverses land owned by the federal government. In plaintiffs' brief, they assert that " '[o]wnership' in the context of this case deals with the right to use the ditch as against other private claimants, not the Federal Government." Moreover, even though the parties each assert "ownership" in the ditch, they appear to agree that "ownership" refers to an exclusive right to use the ditch. Thus, this opinion addresses the rights as between plaintiffs and defendants and does not address the parties' rights as against the federal government or other private parties. *Cf. Gammelgaard v. Hillis Peak Enterprises, Inc.,* 116 Or App 641, 644, 842 P2d 457 (1992), *rev den* 316 Or 527 (1993) ("[B]ecause paramount title to the land remain[ed] in the United States and because the United States was not a party, the trial court could not quiet title to *all* right, title and interests. However, despite the language of the pleadings and judgment, the case was tried by the parties and decided by the trial court solely on issues related to the right to *possession*; therefore, we review the case as a dispute over *possession* only.") (emphasis in original).

[4] The parties, and consequently the trial court, incorrectly referred to section 661 as the Carey Act. The Carey Act is 43 USC § 641 (1994).

rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by this section."[5]

Alternatively, plaintiffs asserted that the patent for Winterville provided the source of their right to the ditch. Plaintiffs concluded that, regardless of the particular origin of their ditch right, the ditch was an appurtenance to Winterville that was conveyed to whoever owned Winterville.

The trial court's original judgment stated, in part:

"1.   [Section 661] does apply so that whenever by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, as the rights to the Pete Mann Ditch System, the same are recognized and acknowledged by the local customs, and the decisions of courts, the posses[s]ors and owners of such vested rights shall be maintained and protected.

"2.   What is commonly known as the Pete Mann Ditch is an accumulation of many sectors of ditch[.] * * * [Those sections] accumulatively make a connecting system of ditches as evidenced by the maps in evidence and the primary Water Right Certificate with the prior date of 1865 issued in 1959 after [a] contested case held in the Circuit Court of Grant County for the John Day River Basin Adjudication. Such ditches and rights of way[] known as the Pete Mann Ditch were accrued and vested in the users and

[5] The first paragraph of section 661 originated from section 9 of the Act of July 26, 1866 (Act of 1866), ch 262, 14 Stat 253. The second paragraph of section 661 originated from section 17 of the Act of July 9, 1870 (Act of 1870), ch 235, 16 Stat 218. Early case law that interpreted the language that is now section 661 often referred to the 1866 and 1870 Acts.

Additionally, in 1976, Congress enacted the Federal Land Policy and Management Act (the FLPMA), Pub L 94-579, 90 Stat 2744 (codified, in part, at 43 USC §§ 1701 to 1782). Section 706(a) of the FLPMA provides that, effective on or after October 21, 1976, certain language in section 661 is repealed insofar as the language applies "to the issuance of rights-of-way over, upon, under, and through the public lands and lands in the National Forest System." 90 Stat 2793. Plaintiffs assert that their right-of-way existed before October 21, 1976. To the extent that plaintiffs are correct, the amendment to section 661 is not applicable and the FLPMA would not have had the effect of terminating plaintiffs' right-of-way. *See* 43 USC § 1769(a) (1994) (providing, in part, that "[n]othing in this subchapter shall have the effect of terminating any right-of-way or right-of-use heretofore issued, granted, or permitted").

builders of the ditches as a project was completed subsequently accruing and vesting in the ongoing users and keepers of the ditch for the purposes to which the ditch was built.

"3. This State Court has no authority to vest ownership of the Pete Mann Ditch in any particular individual, nor does the Court have the authority to deprive anyone of its use.

"4. Plaintiffs are not entitled to the relief sought in their Complaint, and the Defendants are not entitled to the relief sought in their Counterclaims * * *."[6]

On appeal, plaintiffs contend that "[t]he court erred in declaring that it had no authority to determine the competing rights of the parties to the Pete Mann Ditch" and that "[t]he trial court erred in failing to determine that [p]laintiffs had ownership rights in the Pete Mann [D]itch which were paramount and to the exclusion of the [d]efendants."[7] The gravamen of plaintiffs' assignments of error is that they have exclusive rights to the use of the ditch as against defendants and that the trial court erred in failing to quiet title in them. Specifically, plaintiffs assert that the source of their right to the ditch could be found in section 661 or, alternatively, in the language of the patent for Winterville and that, because the ditch was appurtenant to Winterville, the rights to the ditch were conveyed to them when they purchased Winterville. The Hannigans counter that plaintiffs' claim for quiet title must fail either because the Hannigans had acquired the ditch in an assignment from Brandenthaler's widow or

_____

[6] The judgment did not dismiss the parties' claims and counterclaims. Pursuant to ORS 19.270(4), we issued an order that gave the trial court leave to enter a final, appealable judgment. In response to that order, the trial court did so.

[7] Based on the trial court's judgment, we understand that it found that there were water and ditch rights that had vested and accrued under local law and concluded that those rights must be recognized and maintained under section 661. Thus, we understand that, when the trial court stated that it had no authority to vest ownership of the ditch in any particular person or to deprive anyone of its use, it did not mean that it lacked jurisdiction over this case. Cf. *Gibson v. Pacific Summa Capital, Inc.*, 163 Or App 321, 324, 987 P2d 1240 (1999), *rev den* 329 Or 589 (2000) (reasoning that the presumption of concurrent jurisdiction with federal courts "may be rebutted by an explicit statutory directive, unmistakable implication from legislative history or by a clear incompatibility between state and federal interests" and holding that the plaintiffs had presented no credible argument to rebut the presumption of concurrent jurisdiction) (citations omitted).

because the ditch was appurtenant to other mining claims as well as Winterville.

■ We begin by addressing plaintiffs' assertion that section 661 is the source of their ditch rights. According to plaintiffs, section 661 independently granted ditch rights if an individual had a vested and accrued water right under local law and custom. Plaintiffs point to evidence that their predecessors in interest had put water to beneficial use since 1865 and argue that, under section 661, "the rights to a ditch or canal are granted to the person using it, provided that person has vested water rights" and that section 661 "ditches are recognized as appurtenances in that they are a material adjunct to the property that they serve." Plaintiffs assert that their claim to the ditch is "based on water rights actually appurtenant to their property." Thus, we understand plaintiffs' position to be that, because their predecessors had vested and accrued water rights that dated from 1865, section 661 necessarily granted them exclusive rights to the ditch, and plaintiffs received those water and ditch rights as appurtenances when they purchased Winterville.

Plaintiffs' argument, however, was rejected in *Jennison v. Kirk*, 98 US 453, 25 L Ed 240 (1878). In that case, the defendant had appropriated particular waters and constructed ditches to convey those waters to a reservoir to be used as needed. Thereafter, in 1873, the plaintiff's testator constructed a ditch to convey water approximately 17 miles to a locality for various purposes, including mining. The plaintiff's testator's ditch intersected one of the defendant's ditches and diverted the water that it conveyed. In the process of repairing his ditch, the defendant cut and washed away a portion of the plaintiff's testator's ditch. The plaintiff's position was that, of the water right and ditch right mentioned in section 9 of the Act of 1866,

"only the right to the use of water on the public lands, acquired by priority of possession, [was] dependent upon local customs, laws, and decisions of the courts; and that the right of way over such lands for the construction of ditches and canals [was] conferred absolutely upon those who have acquired the water-right, and [was] not subject in its enjoyment to the local customs, laws, and decisions." *Jennison*, 98 US at 456.

The Court rejected the plaintiff's argument. According to the Court, "[i]n no provision of the [A]ct [of 1866] was any intention manifested to interfere with the possessory rights previously acquired, or which might be afterwards acquired; the intention expressed was to secure them by a patent from the government." *Jennison*, 98 US at 459. The Court noted that the author of the Act of 1866 had indicated that "[i]t merely recognized the obligation of the government to respect private rights which had grown up under its tacit consent and approval. It proposed no new system, but sanctioned, regulated, and confirmed a system already established, to which the people were attached." *Id.* The Court noted that the author's understanding expressed "in advocating its adoption" reflected the "probable intention of Congress in the passage of the act." *Id.* at 459-60. The Court concluded:

"Whilst acknowledging the general wisdom of the regulations of miners, as sanctioned by the State and moulded by its courts, and seeking to give title to possessions acquired under them, it must have occurred to the author, as it did to others, that if the title of the United States was conveyed to the holders of mining claims, the right of way of owners of ditches and canals across the claims, although then recognized by the local customs, laws, and decisions, would be thereby destroyed, unless secured by the act. And it was for the purpose of securing rights to water, and rights of way over the public lands to convey it, which were thus recognized, that the ninth section was adopted, and not to grant rights of way where they were not previously recognized by the customary law of miners. The section purported in its first clause only to protect rights to the use of water for mining, manufacturing, or other beneficial purposes, acquired by priority of possession, when recognized by the local customs, laws, and decisions of the courts; and the second clause, declaring that the right of way for the construction of ditches and canals to carry water for those purposes 'is acknowledged and confirmed,' cannot be construed as conferring a right of way independent of such customary law, but only as acknowledging and confirming such right as that law gave. The proviso to the section conferred no additional rights upon the owners of ditches subsequently constructed: it simply rendered them liable to parties on the public domain whose possessions might be injured by such construction. In other words, the United

States by the section said, that whenever rights to the use of water by priority of possession had become vested, and were recognized by the local customs, laws, and decisions of the courts, the owners and possessors should be protected in them; and that the right of way for ditches and canals incident to such water-rights, being recognized in the same manner, should be 'acknowledged and confirmed;' but where ditches subsequently constructed injured by their construction the possessions of others on the public domain, the owners of such ditches should be liable for the injuries sustained. Any other construction would be inconsistent with the general purpose of the act, which, as already stated, was to give the sanction of the government to possessory rights acquired under the local customs, laws and decisions of the courts." *Id.* at 460-61.

Thus, *Jennison* stands for the proposition that section 661 recognized water rights and rights to ditches that existed under local law and custom and was not an independent source of water or ditch rights.[8]

Here, plaintiffs argue that section 661 granted ditch rights to those with water rights. Even if we assume that plaintiffs' predecessors in interest acquired a water right that originally vested and accrued in 1865 and that plaintiffs currently have a water right that can be traced back to that 1865 right, plaintiffs' argument fails under the reasoning in *Jennison*. Consequently, because all of plaintiffs' arguments

---

[8] *See California v. United States*, 438 US 645, 656 & n 11, 98 S Ct 2985, 57 L Ed 2d 1018 (1978) (reasoning that section 9 of the Act of 1866 "was not itself a grant of water rights pursuant to federal law" and that the Act of 1870 "reaffirmed that occupants of federal public land would be bound by state water law"); *Power Co. v. Cement Co.*, 295 US 142, 155, 55 S Ct 725, 79 L Ed 1356 (1935) (reasoning that the Act of 1870 amended the Act of 1866 and that the effect of the Acts of 1866 and 1870 was "not limited to rights acquired before 1866" but instead "reach[ed] into the future as well, and approve[d] and confirm[ed] the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test and measure of private rights in and to the non-navigable waters on the public domain"); *Broder v. Water Co.*, 101 US 274, 276, 25 L Ed 790 (1879) (reasoning that section 9 of the Act of 1866 "was rather a voluntary *recognition of a pre-existing right of possession*, constituting a valid claim to its continued use, than the establishment of a new one") (emphasis in original); *see also Carson v. Gentner*, 33 Or 512, 517, 52 P 506 (1898) ("It has been repeatedly held that the provisions of * * * section [9 of the Act of 1866] only confirm to the owners of ditches and water rights on the public domain the same privileges which they enjoyed under the local customs, laws, and decisions of the courts prior to its passage.").

concerning section 661 are based on the correctness of the proposition that section 661 is an independent source of rights and that proposition is incorrect, we need not address plaintiffs' other arguments concerning that statute.

■    Alternatively, plaintiffs assert that the ditch "was originally appurtenant" to Winterville under the terms of the patent that the United States issued to Mann, Travillion and Stevens, and, consequently, the ditch was conveyed to plaintiffs when they purchased Winterville. Plaintiffs conclude that, because the ditch was appurtenant to Winterville, it could not be conveyed away from Winterville, and any deed that conveyed Winterville conveyed the ditch regardless of whether the term "appurtenances" was used. Thus, because plaintiffs own Winterville, they own the ditch.

Plaintiffs' argument rests on the proposition that the United States conveyed the ditch as an appurtenance.[9] The patent for Winterville granted the "mining premises, together with all the * * * appurtenances of whatsoever nature thereunto belonging, * * * subject nevertheless to the following conditions and stipulations[,]" including "vested and accrued water rights for mining, agricultural, manufacturing or other purposes, and *rights to ditches* and reservoirs used in connection with such water rights as may be recognized and acknowledged by the laws, customs and decisions of courts." According to plaintiffs, the evidence in the record, including the patent and the patent application, demonstrates that the ditch served only Winterville; thus, it was an appurtenance.[10]

---

[9] For purposes of addressing plaintiffs' argument, we assume without deciding that a mining ditch, which did not run through or border a mining claim, could be conveyed as an appurtenance to the mining claim in a patent issued by the United States.

[10] For example, plaintiffs refer to the 1886 affidavit of a United States Deputy Mineral Surveyor. In that affidavit, the surveyor stated that the labor performed on Winterville consisted "of worked ground races flumes 600 f[ee]t of hydraulic iron pipe and ditches and is equal in value to the sum of $500.00 for each 20.00 acres" and that the water for working the claim "is obtained from Bear Gulch and Elliott Ditches and conveyed to claim by ditches about 15 miles in length." The affidavit also stated that "the nearest quartz lode or deposit known in [the] vicinity is distant about one mile[.]" However, that evidence does not establish that Mann, Travillion and Stevens owned or had any interest in the ditches that were used to convey water or that the ditch served only Winterville.

To understand whether the ditch passed as an appurtenance in the patent from the United States, *Nevada Ditch Co. v. Bennett*, 30 Or 59, 45 P 472 (1896), is instructive. The plaintiff in that case sued to establish the date and extent of its appropriation of water from the Malheur River. One of the defendants, Pacific Live Stock Company (Pacific), claimed an appropriation that was prior to the plaintiff's appropriation. Two of the irrigation ditches on Pacific's property originally had been constructed by agents of the United States. The United States eventually issued patents for the property to Bradley and Overfelt. Pacific eventually acquired title from Bradley and Overfelt.

On appeal, Pacific argued that the United States had made an appropriation of water and constructed the ditches to divert the water and "that, having granted the lands upon which the ditches are located and the water was utilized, with their appurtenances, the grant carried with it the appropriation, all of which [Pacific] has acquired through mesne conveyances from the government." *Nevada Ditch Co.*, 30 Or at 102. The Supreme Court noted that the heads of the ditches were located on Bradley's land and that

> "the government issued to him the usual patent therefor, containing the following conditions and reservations, viz.: 'To have and to hold the same together with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging * * * subject to any vested and accrued water right[ ] for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws, and decisions of courts, etc.' " *Id.* at 103.

The patent that the United States issued to Overfelt contained "like conditions and reservations in every respect as the Bradley patent, except the words 'improvements, tenements,' [were] inserted and precede the words 'rights, privileges, immunities, and appurtenances.' " *Id.* The court held that "the ordinary patent would not carry with the lands the public use made of the waters upon such lands as an appurtenant thereto." *Id.* at 105. However, the court also stated:

> "But if we are mistaken in this view of the question, there is another matter connected with the transaction which is

fatal to the Pacific Live Stock Company's claim. It derives its title through patent from the government, which is a grant 'subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws, and decisions of courts.' This is an implied recognition of such rights of prior appropriators as had at the date of the patent been established, and a direct transfer expressly subject to such rights. And the patentee and, *a priori*, his successor in interest, can take no larger estate than the government has been pleased to grant[.] * * * So that the company is especially estopped by its muniments of title from claiming as a specific grant from the government, whether as an appurtenant or otherwise, the usufruct of the waters of the Malheur River and its tributaries, as against any and all persons who acquired rights as prior appropriators of the waters of such streams before the issuance of the patents to Bradley and Overfelt." *Id.* at 106.

Here, the language in the patent issued to Mann, Travillion and Stevens is substantively similar to the language in patents that the court analyzed in *Nevada Ditch Co.* Although *Nevada Ditch Co.* involved water rights, the reasoning applies to this case involving ditch rights; thus, the United States would not have conveyed the entire ditch to plaintiffs' predecessors in interest under the term "appurtenances" in the patent if there were preexisting water or ditch rights. Because plaintiffs have the burden of proving that their title is superior to that of defendants and must prevail on the strength of their title as opposed to the weaknesses of defendants' title, in order to prevail on their theory, plaintiffs must prove that there were no preexisting rights in the ditch when the patent was issued. *See Rohner et ux v. Neville*, 230 Or 31, 38-39, 365 P2d 614, 368 P2d 391 (1962).

The record here contains numerous exhibits that reflect the conveyance of *sections* of the ditch, mining claims other than Winterville and water rights from as early as the 1860s. The evidence demonstrates that, between the mid-1800s and 1890, the year the United States issued the patent, water rights and rights in sections of the ditch were sometimes sold apart from a mining claim. The evidence also demonstrated that many individuals bought and sold interests in

sections of the ditch.[11] Some of the deeds indicate that the sections of the ditch were to be used by various individuals to convey water to mining claims other than Winterville. The evidence does not demonstrate that plaintiffs' predecessors in interest had acquired all water rights and all rights to the ditch by the time the patent was issued. Additionally, there was evidence in the record that demonstrates that sections of the ditch continued to be bought and sold after the patent was issued. In short, the evidence does not appear to provide a complete history of the rights to the various sections of the ditch. Thus, plaintiffs did not demonstrate that there were no preexisting ditch rights at the time that the patent was issued; consequently, we conclude that the patent did not convey the entire ditch to plaintiffs' predecessors in interest. Because plaintiffs have not proved that title to the ditch should be quieted in them, the trial court correctly denied plaintiffs relief under that theory.

Affirmed.

---

[11] In 1890, "[d]itches used for mining purposes and mining flumes, permanently affixed to the soil, be and the same are hereby declared real estate during the time the same shall be used for that purpose[.]" Annotated Laws of Oregon, v II, ch LX, § 3833, p 1639 (Hill 2d ed 1892) (section 3833). Additionally, "[t]he laws relative to the sale and transfer of real estate, and the application of the liens of mechanics and laborers therein, be and they are hereby made applicable to said ditches and flumes; *provided*, that all interests in mining claims known as placer or surface diggings may be granted, sold, and conveyed by bill of sale and delivery of possession, as in cases of the sale of personal property[.]" Annotated Laws of Oregon, v II, ch LX, § 3834, p 1640 (Hill 2d ed 1892). In *Mattis v. Hosmer*, 37 Or 523, 62 P 17, 62 P 632 1900), the issues were whether the plaintiff or the defendant owned a mining ditch and whether the ditch could be conveyed without a deed. The court explained the purpose of section 3833:

"[T]he evidence conclusively shows that the ditch was constructed, and at the time of the alleged transfer was being used, for mining purposes. In the enactment of such statute it was probably assumed that the transfer of a ditch used for mining purposes implied a change in its location, or the appropriation of the water to other premises or to different uses, thereby necessitating a severance of the easement from the servient estate, to accomplish which it was provided that the evidence of such conveyance should be more formal than in cases of the transfer of placer mines, which was effected by a bill of sale or a delivery of the possession, thereby carrying the ditch used in operating the mine as appurtenant thereto." *Mattis*, 37 Or 534-35.

Although *Mattis* supports the general proposition that a mining ditch is considered an easement, it also indicates that, in the 1800s, ditches could be sold apart from a mining claim. Some evidence in this case demonstrates that practice.