Argued January 12; affirmed February 1, 1944

# W. A. WOODARD LUMBER CO. *v.*
# UNEMPLOYMENT COMPENSATION
# COMMISSION

(145 P. (2d) 477)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Custer E. Ross,* of Salem (Ross & Lewelling, of Salem, on the brief) for appellant.

*H. Lawrence Lister,* assistant Attorney General (I. H. Van Winkle, Attorney General; and H. Lawrence Lister, assistant Attorney General, on the brief) for respondent.

BELT, J. Plaintiff brought this proceeding under and by virtue of the Declaratory Judgment Act (§§ 6-601 to 6-616 O. C. L. A.) to obtain a construction of § 126-716 O. C. L. A. and to be relieved of any charge against its experience rating with the defendant commission by reason of unemployment compensation paid by it to the employees of the plaintiff.

A demurrer to the amended complaint was sustained and, upon refusal of the plaintiff to plead further, the suit was dismissed. Plaintiff appeals.

Plaintiff, in 1940, owned and operated a sawmill south of Cottage Grove, Oregon. The manufactured lumber was transported by flume to the railroad about eight miles distant where it was shipped to the trade.

It is alleged—and it is admitted on demurrer—that "no other method or means was available or practical for moving plaintiff's lumber from its point of manufacture to a point of transportation to its customers."

The federal government, during such time, was engaged in the public project of constructing the "Coast Fork Dam" and, by reason thereof, it was deemed necessary by it to acquire certain property owned by the plaintiff and used in connection with the operation of its sawmill. It is alleged in substance that the government threatened forthwith to institute condemnation proceedings to acquire such property but that, soon thereafter, plaintiff agreed to sell the property to the government and the latter entered into possession thereof. It is charged that because of said "appropriation" of such properties, it was impossible for plaintiff to continue operation of its sawmill and it was "forthwith wholly discontinued", from August 21, 1940, to December 26, 1940. The mill was moved to a place adjacent to the Southern Pacific R. R. Company's tracks. During the time the mill was thus caused to be shut down, a large number of plaintiff's employees were unemployed and, on account thereof, they received compensation aggregating $3,295.47 during the period of their unemployment. It is alleged that the defendant commission has charged the amount thus expended against the experience rating of the plaintiff employer and that if plaintiff is not relieved from these benefit charges, the amount of contribution which it will be obliged to make to the unemployment compensation trust fund will, in the future, be increased.

Plaintiff further alleged "that promptly on the closing down of the operations of said sawmill, defendant was notified thereof, and a proper and complete

showing made in that regard by plaintiff to defendant; that notwithstanding such showing, defendant has refused, and still does refuse to relieve plaintiff from said benefit claims so paid by defendant to various of plaintiff's employees who lost their employment because of the taking of plaintiff's property through the powers of eminent domain of the United States."

In seeking to be relieved of the benefit charges against its experience rating, the plaintiff relies upon that part of § 126-716 O. C. L. A. which provides:

"The commission may, upon proper showing by an employer and in accordance with regulations prescribed by the commission, relieve the employer from benefit charges where the unemployment of the individuals to whom benefits are paid is due to an act of God, catastrophe not attributable to the employer, or by operation of law."

Plaintiff contends that the unemployment in question was caused by (1) a catastrophe not attributable to it; or (2) operation of law. No claim is made that the unemployment was due to an act of God.

The defendant commission denies that it appears from the amended complaint that the unemployment was thus caused. The commission also contends that the above statutory provision was repealed by Chapter 448, Laws of Oregon for 1941, but the plaintiff asserts that its rights were vested by virtue of the law then in force and effect during the year 1940, when the sawmill was shut down and that the repeal of the above-quoted provision did not affect such rights.

The vital question is whether, under the facts alleged, the unemployment was caused either by a catastrophe not attributable to the employer or by operation

of law. If the unemployment was not so caused, plaintiff would not be entitled to relief and it would be unnecessary to consider the other questions presented on this appeal.

■ There is no statutory definition of "catastrophe" or the phrase, "operation of law". We agree with appellant that no definition of these terms by the commission inconsistent with or contradictory to the legal meaning thereof has any force or effect. In what sense did the legislature use such terms is the more pertinent inquiry. Unless the words, "catastrophe" and "operation of law" have some technical meaning, they must be considered in the light in which they are ordinarily used and understood.

■ It is significant that no relief to an employer was permitted under § 126-716 O. C. L. A. if the unemployment was caused by a catastrophe attributable to an employer. In other words, if the mill were destroyed by reason of a catastrophe caused through the negligence of the employer, the unemployment resulting therefrom would be charged against the experience rating of the employer. Unemployment due to an act of God would, of course, preclude intervention of any human agency. Likewise, unemployment caused by operation of law would not be the result of the action of any person but would be the effect of the law itself. We think the legislative intent is clear that an employer is not entitled to relief from such benefit charges if the employer has anything to do with causing the unemployment.

■ The allegation that plaintiff's employees lost their employment because of the taking of the property "through the power of eminent domain of the United

States" is a mere conclusion of the pleader. The most that can be said of the complaint is that, when the federal government threatened to exercise such power, the plaintiff and the government agreed upon the purchase price of the property. The property was not acquired by the exercise of the power of eminent domain. It was acquired by purchase. If plaintiff and the government had not agreed on the value of the property, condemnation proceedings might, or might not, have been instituted. Be that as it may, it is clear from the complaint that it was the act of plaintiff which enabled the government to obtain title to the property. Of course, the government could have taken possession of the property without first having had the damages assessed, but it did not do so. According to the complaint, it entered into possession of the property after agreement relative to the purchase price was made with the plaintiff.

■ Was the unemployment caused by a catastrophe? Webster's Dictionary thus defines the word: "A final event, usually of a calamitous or disastrous nature. A sudden calamity; a great misfortune." It is synonymous with "disaster". It means a notable disaster; a more serious calamity than might ordinarily be understood from the term "casualty": 6 Words and Phrases (Perm. Ed.) 309; *Reynolds v. Board of Commissioners*, 139 La. 518, 71 So. 787. We know not how much the government paid to acquire the flume and the other property rights of the plaintiff, but it is assumed that the price did not come within the category of a financial disaster or misfortune. It may be that the loss of profit caused by cessation of work was taken into consideration in fixing the purchase price of the property. Who knows? Accepting the word "catastro-

phe'' in its plain and ordinary sense, we are convinced that the unemployment was not thus caused. Neither do we think the plaintiff seriously contends to the contrary.

Plaintiffs real contention is that the unemployment was caused by operation of law. There is a surprising dearth of authority on the subject. After diligent research, we have been unable to find any decision based upon a similar factual situation—and none has been cited.

■ Operation of law: Such phrase is used to describe a method by which title to property is transferred. It includes a transfer by intestacy. A right to an estate of one who dies intestate is cast upon the heir at law by operation of law: *La Chapelle v. U. P. Coal Co.,* 29 Wyo. 449, 214 P. 587. It is a right not acquired by any act of the party in whom the estate is vested but is the effect of the law applicable thereto. In 46 C. J. 114, it is thus defined: ''The obligation of law; its practical working and effect; a term applied to indicate the manner in which a party acquires rights without any act of his own.'' To the same effect, see cases collated in 29 Words and Phrases (Perm. Ed.) 578. Bouvier's Law Dictionary (3d Revision) 2417 gives this definition: ''A term applied to indicate the manner in which a party acquires rights without any act of his own;'' quoted with approval in *Ray v. Industrial Insurance Commission,* 99 Wash. 176, 168 P. 1121, L. R. A. 1918 F, 561.

If, in the instant case, the federal government, in the exercise of its sovereign power, had taken the property of plaintiff for a public use, a different question would be presented. Then it might well be argued that it was

through the operation and effect of the law that the property was acquired, however, that is not the case. The property was acquired as the result of an agreement. It was not by operation of law.

The decree is affirmed. Neither party will recover costs or disbursements.