Argued and submitted October 3, 1983, affirmed April 17, petition for rehearing denied
May 22, 1984

EVANS et ux,
*Respondents on Review,*

*v.*

HOGUE et al,
*Petitioners on Review.*

(41-025; CA A22210; SC 29674)

681 P2d 1133

Donald J. Morgan, Portland, argued the cause for petitioner on review Jeannette K. Mundt. With him on the briefs was Wood Tatum Mosser Brooke & Holden, Portland.

Andrew Rich, Hillsboro, argued the cause for respondents on review. With him on the brief was Huffman and Zenger, P.C., Hillsboro.

ROBERTS, J.

Lent, J., dissented and filed an opinion.

Campbell, J., dissented and filed an opinion.

## ROBERTS, J.

This appeal is from an action to quiet title. The trial court awarded title to plaintiffs. The Court of Appeals also found for plaintiffs by concluding that plaintiffs had adversely possessed against their predecessors for the requisite period. We affirm but on different grounds.

The disputed land consists of approximately two and one-half acres and is located as shown on the diagram.

In 1905 a survey established the boundary between the two parcels of land as shown on the diagram at the fence line. The Halls were the owners of the easterly parcel for which plaintiffs Evans have title. The Halls built the fence. In 1935 the Halls conveyed their record title to W.N. Hall. After several conveyances Sampsons became owners of the property in 1948. Sampsons conveyed to Luckeys in September, 1970 and Luckeys conveyed to plaintiffs in separate transactions in 1974 and 1975. The original deed from the Halls did not contain a description of the disputed tract nor did any subsequent deed by grantors of plaintiffs' tract. Deeds to defendants' land, however, always included the disputed strip in their description.

The evidence presented at trial indicated that during the time Sampsons owned the land all the requirements for adverse possession were met. However, when Sampsons sold to Luckeys, and the Luckeys to plaintiffs, the deed did not contain a description which included the strip. In May, 1981, after the commencement of this action but before trial Sampsons conveyed, by way of quitclaim deed, their interest in the tract to Mary Wall,[1] the common grantor of the defendants.

---

[1] The common grantor appears in the record as Mary Wall Baker. The opinions throughout this case refer to the same person as Mary Wall and Mary Baker Wall.

The question here involves how interests in property acquired by adverse possession can be transferred to subsequent purchasers.

The trial court found that the interest of plaintiffs' predecessors in the adversely possessed strip was transferred to plaintiffs. The method of this transfer is not explained.

The Court of Appeals affirmed the trial court. It first rejected plaintiffs' argument that they could acquire title to the property by tacking their period of occupation and the Luckeys' period of occupation onto Sampsons' successful adverse possession to claim adverse possession against defendants. The court held that Sampsons had acquired legal title to the property and their interest could be conveyed only by operation of law or by deed. The Court of Appeals decided this case in plaintiffs' favor, however, by concluding that plaintiffs, by tacking their possession with Luckeys' possession, had held adversely against Sampsons for the requisite number of years. At the time plaintiffs filed this action they were four months short of the 10 years. The Court of Appeals nonetheless concluded that the 10 years continued to accrue after plaintiffs filed suit and up to the time the Sampsons conveyed their interest to defendants. We agree with the dissent below that this is an erroneous application of the statute of limitation, ORS 12.050.

At the trial, plaintiffs proceeded on the theory of uninterrupted continuous adverse use and defendants defended with their record title and claims that plaintiffs were estopped by delay to raise their own or their predecessors' interest in the land. Defendants cited *Duval v. Miller,* 208 Or 176, 300 P2d 416 (1956) for the first time and relied on it exclusively in the Court of Appeals. Although the Court of Appeals distinguished that case in a footnote, it seems to apply. *Duval* held that the doctrine of tacking applies only when one person in adverse possession for less than the prescriptive period and another in privity with him continue the adverse possession for a time sufficient to complete the 10 year prescriptive period; the doctrine cannot be applied where a predecessor has already acquired title by adverse possession prior to conveying the property. We take the opportunity to address the case here.

There were two *DuVal* cases involving the same parties and the same disputed property. In the first, *DuVal v. Miller,* 183 Or 287, 192 P2d 249, 192 P2d 992 (1948), plaintiffs in possession sued to quiet title to a strip of land separating their property from defendant's. Plaintiffs asserted that their predecessors, the Duncans, held the property adversely for more than 10 years. Defendant defended with her record title. Though plaintiffs were able to produce evidence that the Duncans adversely possessed the strip from 1929 to 1941, they failed to allege how the Duncans' interest might have accrued to themselves. On rehearing the court pointed out plaintiffs' mistake. Plaintiffs had failed to allege or prove their privity with Duncans. The court stated that it had no intention to detract from *Vance v. Wood,* 22 Or 77, 29 P 73 (1892), or *West v. Edwards,* 41 Or 609, 69 P 992 (1902), cases which *DuVal* summarized as permitting "an adverse possessor to tack his possession on to that of a previous adverse possessor, if privity existed between the two," 183 Or at 294, but plaintiffs had simply made no attempt to establish their continuity of adverse use after the Duncans. The court observed, "we are satisfied that shortly after [plaintiffs] received their deed, [defendant] asserted title to the disputed strip and the right to its possession," 183 Or at 295. Defendant's acts of dominion over the property, of course, destroyed any claim plaintiffs could make to continued exclusive possession of the land, a prerequisite to privity. "[I]f the possession of the Duncans was of the character required by the rules which give effect to adverse possession, the [plaintiffs'] possession did not come up to that standard. It was not exclusive." 183 Or at 296.

In the second case, 208 Or 177, 300 P2d 416 (1956), the same plaintiffs sued for ejectment after defendant dispossessed them from the disputed strip. The trial court found continuity of use sufficient to establish plaintiffs' privity with Duncans and held that plaintiffs could tack their period of possession onto their predecessors'. This court applied a theory new to Oregon, that a possessor cannot tack a predecessor's period of possession if the predecessor already adversely possessed for the statutory period. The court limited the doctrine of tacking to those situations where it was necessary "to establish continuous possession for the statutory period." 208 Or at 183.

The court cited prior cases as authority for its limited application of the tacking doctrine, but none provides any actual support. *Anderson v. Richards,* 100 Or 641, 198 P 570 (1921); *Clark v. Bundy,* 29 Or 190, 44 P 282 (1896); and *Vance v. Wood, supra; Rowland v. Williams,* 23 Or 515, 32 P 402 (1893); applied the doctrine of tacking in factual settings where a claimant's predecessors' possessory period happened not to exceed the statutory period. There is no indication that the application of the doctrine would differ had a predecessor, or a series of predecessors, already achieved continuous adverse possession for the statutory period. In fact, *Quinn v. Willamette Pulp & Paper Co.,* 62 Or 549, 126 P 1 (1912), also relied on in *DuVal,* allowed plaintiffs to tack their period of possession onto their predecessor's even though the predecessor had established his possessory rights for the full 10 year period. The *Quinn* court rejected defendant's claim of record title stating:

> "There had been time for the statute of limitation to have run three times before the defendant ever had anything to do with the land in dispute; and the title of Pacquet, plaintiff's grantor, was perfected before that time. Since then there has been nothing to divest him or his grantee of such title." 62 Or at 555.

*Low v. Schaffer,* 24 Or 239, 33 P 678 (1893), the case *DuVal* cites as primary authority for its limitation on tacking, does not espouse such a rule. The case involved tacking of possessory rights to land and water use gained by prior, continuous use and appropriation. The total period during which defendants' predecessors held the rights adversely to the first appropriator exceeded 10 years. Defendant was able to demonstrate his privity with his immediate predecessor but could not show privity between the next two grantors up the line, Huffman and Hindeman. The lack of privity had nothing to do with one or the other having adversely possessed in his own right for the statutory period. Huffman did not convey his possessory interest to Hindeman; Hindeman contested Huffman's ownership and was awarded a patent for the land after an adjudication, a situation that defeated privity between them. The court restated the principle that possessory interests in land may be transferred by oral agreement, 24 Or at 242. Neither the facts of the case nor the

generality with which the principle of tacking is set forth supports the *DuVal* decision.

In a later case, *Rohner v. Neville,* 230 Or 31, 365 P2d 614, 368 P2d 391 (1962), we were faced with a fact situation very similar to that in *DuVal.* In *Rohner* plaintiffs' predecessor adversely possessed property adjacent to the property described in his deed. The parcel was not included in the deed when he sold the property to plaintiffs. The defendants in *Rohner,* like the defendants here, cited the *DuVal* cases for the proposition that the plaintiffs could not avail themselves of the rights of their predecessors without a description of the disputed land in their deed. *Rohner* acknowledged *DuVal* and even applied some of the rationale from the cases: "In one respect the case at bar resembles the *DuVal* cases, * * *, in that the instant case does not involve tacking. [Plaintiffs' predecessors] obtained title to the land by adverse possession. Their title was good against all the world." 230 Or at 41. But the court rejected the rest of the analysis and found that plaintiffs should prevail in the quiet title action because they had "an equitable claim derived from the possessory rights of their predecessors * * *." 230 Or at 38.

Like *DuVal, Rohner* suffers from a lack of supporting authority. The nature of plaintiffs' "equitable claim" is scantily described. It appears to arise from the possibility that plaintiffs could have sought reformation of their deed against their grantor and received title to the adversely possessed parcel through written conveyance. In supplemental briefs on this point the parties in the instant case seem to agree that this was the derivation of the "equitable claim." Plaintiffs suggest that the "equitable claim" may also represent notions of estoppel of the predecessors to claim their possessory rights in light of evidence that both grantor and grantees believed the disputed parcel was included within the deed description. Yet whatever claims plaintiffs theoretically may have asserted against their grantors, *Rohner* does not explain to our satisfaction how these claims enhance or detract from plaintiffs' rights against the titled property owners. The evidence upon which *Rohner* relied to find an "equitable claim" is nothing more than such as would support a claim of privity between successive property owners for purposes of tacking possessory interests in land.

■     The instant case presents us for the third time with the question how a possessory interest in property is transferred through many years of adverse use.

The principle of property ownership upon which *DuVal* is premised is certainly valid: one who has adversely possessed land for the requisite number of years gains ownership rights to the land of a status equal to deeded title. However, applying the principle in cases where the adverse possessor has never asserted his or her acquired ownership rights, either while in possession, at the time of transfer of possession, or within 10 years after he was "possessed of the premises," ORS 12.050, is not free from difficulty. The single case we found applying *DuVal* provides an illustration. In *Meyer v. Ellis*, 411 P2d 338 (Wyo 1966), plaintiff sued for a declaration of his rights to a tract of land adjacent to his farm and for an injunction to prevent defendants, the record title holders, from entering the property. Plaintiff based his claim on adverse possession. Defendants countered with a quiet title action relying on their deed. The evidence showed that plaintiff's grandfather had adversely possessed the tract for many years before he conveyed the farm to plaintiff. Both grantor and grantee had assumed that the tract was included in the deed description. The court rejected plaintiff's reliance on tacking:

> "As we view the record in the instant case the doctrine has no application. The doctrine was engrafted upon the general principles of the law of adverse possession for the purpose of meeting the requirement of 'continuous' possession for the statutory period. Du Val v. Miller, 208 Or 176, 300 P.2d 416, 419, 420; Rohner v. Neville, 230 Or 31, 365 P.2d 614, 618, rehearing denied 368 P.2d 391; El Cerrito, Inc. v. Ryndak, 60 Wash.2d 847, 376 P.2d 528, 533. If, as the trial court found, the grandfather long prior to the year 1960 acquired title to the disputed tract by adverse possession, such title became vested and was good against the world, including the predecessors of the defendants. * * * 'Tacking' could not aid or detract from that title and such title could be divested only by a conveyance, by descent or by operation of law. Du Val v. Miller, supra; El Cerrito, Inc. v. Ryndak, supra." (Citations omitted.) 411 P2d at 340.[2]

---

[2] *El Cerrito, Inc. v. Ryndak*, 60 Wash 2d 847, 376 P2d 528 (1963) provides no support for the Wyoming decision. In fact, *El Cerrito, Inc.* illustrates Washington's

On the other hand, the court found that defendants had no interest in the property at all, having lost it by adverse possession. They were enjoined from interfering with plaintiff's use of the land. The result was no doubt unsatisfactory from everyone's point of view: plaintiff was left with possessory rights but no legal interest in the tract. Defendants had neither. And grandfather, the only one who might have offered assistance by conveying his interest in a written instrument, was dead.

An analysis that results in such uncertainty in property ownership strikes us as unsatisfactory. In *Meyer,* for example, as in *DuVal,* it appears that the plaintiffs' rights would remain unsettled until plaintiffs adversely possessed against their predecessors for the statutory period. It even appears possible that the predecessors' heirs could initiate an ejectment action against plaintiffs to recover the property. And we are dissatisfied with the sparse analysis and lack of precedent in *Rohner.* For the reasons developed in this opinion, we reject the limitation *DuVal* and *Rohner* place on conveying an interest in property adversely possessed. We are left with a consideration of the statute upon which actions on real property are brought.

Plaintiffs in this case, as persons in possession of the disputed strip, may resolve their property interests in a suit to quiet title. ORS 105.605.[3] Defendants in this case, as title holders and nonpossessors of the property, assert their rights

---

very different application of the tacking doctrine. Under Washington law, there is no limitation on tacking when a predecessor has already adversely possessed for the statutory period. The only prerequisite to a transfer of the interest is privity. *El Cerrito* states the Washington rule that "one who did not acquire title by adverse possession must show his privity to the one who did so acquire title if he is basing his claim upon his predecessor's title." 60 Wash 2d at 855-56. As the case illustrates, privity may be established by intent of the parties or by a conveyance of the interest in a written instrument. *See also Heriot v. Lewis,* 35 Wash App 496, 668 P2d 589 (1983); *Howard v. Kunto,* 3 Wash App 393, 477 P2d 210 (1970).

[3] ORS 105.605 provides:

"Any person claiming an interest or estate in real property not in the actual possession of another may maintain a suit in equity against another who claims an adverse interest or estate therein for the purpose of determining such conflicting or adverse claims, interests or estates. * * *."

in an ejectment action. ORS 105.005.[4] The limitation period is found in ORS 12.050, which provides:

> "An action for the recovery of real property, or for the recovery of the possession thereof, shall be commenced within 10 years. No action shall be maintained for such recovery unless it appear that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises in question within 10 years before the commencement of the action."

A party asserting his rights to the property must show that he or she was "seized or possessed of the premises" within 10 years before the commencement of the action. "Seized" denotes a right to possession under legal title. 1 H. Tiffany Real Property § 20, at 26 (3d ed 1975). "The requirement of seisin is satisfied where the party opposing an adverse claimant is the holder of the legal title." (Footnote omitted.) 4 H. Tiffany Real Property § 1133, at 694 (3d ed 1975).

■ ■ Adverse possession is a method of transferring "ownership of land through nonassertion of title thereto, coupled with unauthorized possession thereof by one lacking good title * * *." *Id.,* § 1132, at 691. As a general rule, title holders have no obligation to assert their right to possession, *Ryburn v. Marshall,* 265 Or 30, 507 P2d 1142 (1973), and transfer of interest in land does not occur by mere lapse of the statutory period alone. *See* Note, A Reevaluation of Adverse Possession as Applied in Boundary Dispute Litigation, 3 Rut-Cam LJ 293, 294 (1971). However, if the land is in the possession of another and if the possessors' occupation of the land meets the requirements for adverse possession, that is, if the occupiers' possession is sufficiently conspicious so that the true owner should have asserted his rights, the title holders' nonassertion of rights will result in eliminating his interest in the property and transferring that interest to the possessor.[5]

---

[4] ORS 105.005 provides:

"Any person who has a legal estate in real property and a present right to the possession thereof, may recover possession of the property, with damages for withholding possession, by an action at law. The action shall be commenced against the person in the actual possession of the property at the time, or if the property is not in the actual possession of anyone, then against the person acting as the owner.thereof."

[5] Tiffany explains the operation of statutes of limitation as follows:

"Ordinarily at least, the statutes of limitation with reference to land in terms impose no requirement upon the person in wrongful possession as to the character

The adverse possessor then acquires "perfect title" to the land. *Spath v. Sales,* 70 Or 269, 273, 141 P 160 (1914).

■ The period of possession may be completed by one possessor for the full statutory period or by a series of possessors in privity with each other under the doctrine of tacking. *Vance v. Wood, supra; West v. Edwards, supra.*

> "Where the same claim of title has been consistently asserted for the statutory period by persons in privity with each other, there is the same reason to quiet and establish the title as where one person has held. The same flag has been kept flying for the whole period. It is the same ouster and disseisin. If the statute runs, it quiets a title which has been consistently asserted and exercised as against the true owner, and the possession of the prior holder justly enures to the benefit of the last." Ballantine; *Title By Adverse Possession,* 32 Harv L Rev 135, 158 (1918).

■ Tacking is the doctrine recognizing that possessory interests in property may be passed through a series of possessors if they are in privity with each other. Privity exists if successive possessions are connected by an understanding that the rights of the possessor will be transferred, and if a transfer of possession in fact occurs. *West v. Edwards,* 41 Or at 614. It is the law in this state that:

> "In order to create the privity requisite to enable a subsequent occupant to tack to his possession that of a prior occupant, it is not necessary that there should be a conveyance in writing. It is sufficient if it be shown that the prior occupant transferred his possession to him, even though by parol." *Vance v. Wood,* 22 Or at 88.

---

of his possession necessary to make the bar effective, and it is merely by reason of the endeavor of the courts adequately to protect the interests of the rightful owner that certain requirements in this regard have become established. The most important of these requirements is that to the effect that the possession must be hostile or 'adverse' to the true owner, and so generally has this requirement been recognized, and so important has it been regarded, that the expression 'adverse possession' has come to be generally applied to describe that branch of the law which has to do with the construction and application of the statutes of limitation in reference to land. The emphasis thus laid upon the character of the wrongful possession has the unfortunate effect of obscuring the theory on which, as above stated, these statutes appear properly to operate, that is, that, like other statutes of limitation, they bar the remedy of the person rightfully entitled not by reason of any merit in the wrongdoer, but by reason of the demerit of the person who, having a remedy, fails to exercise it within the time named in the statute." (Footnote omitted.) 4 H. Tiffany, Real Property § 1135, at 699 (3d ed 1975).

Where the circumstances show an intent to transfer the grantor's interest in the property not included in the deed, we have recognized a transfer of the grantor's interest in those cases in which the grantor's adverse use of the property has been less than 10 years. We see no reason why a predecessor's interest in the property attained by possessing the property for the full statutory period cannot be transferred in the same way, so long as there is a similar intent between grantor and grantee. We now hold that where there is evidence of intent between grantor and grantee to transfer the grantor's interest in property, the grantee may acquire the grantor's interest, vested and complete, in those situations in which the grantor has adversely possessed for the statutory period.

■ Plaintiffs in the instant case presented evidence of each predecessor's intent to convey possessory rights to the land not included in the deed description. The fence, which serves to contain the cattle that graze on plaintiffs' side, has divided the properties since approximately 1920. It is at the fence that the use of the land changes. Plaintiffs' side has always been used for farming and cattle grazing. Defendants' side has always been in timber. The real estate agent who sold the property for the Sampsons testified that the property had been described to him as encompassing all the land up to the fence. The same agent sold the land to plaintiffs. He testified that he and Evans walked the entire fence line and it was their understanding that the fence was the boundary. During Sampsons' ownership and until the present time, plaintiffs' property has supported cattle and they grazed the entire parcel up to the fence.

It is apparent from this testimony that Sampsons intended to sell, and their grantees the Luckeys thought they had bought, the property up to the fence line.[6] Similarly, the evidence supports the conclusion that Luckeys intended to

---

[6] We pause here to point out that the dissent by Justice Campbell arbitrarily has determined that a bundle of sticks is made up of ten. It also contends, without authority, that when Sampsons conveyed to Luckeys, Sampsons retained 9.5 of those sticks, a figure representing Sampsons' "whole title less the oral rights of possession," and Luckeys, even with rights of possession, gained only 0.5 of the sticks. We have found authority, albeit somewhat out of date and admittedly unshepardized, for a different division of sticks. That authority states: "Possession is eleven points of the law and they say there are but twelve." Ray, *Proverbs* (1678), quoted in McNamara, *2,000 Famous Legal Quotations* 451 (1967). The dissent by Justice Campbell is wrong. Clearly, there are twelve sticks in a bundle; Luckeys had eleven and Sampsons had one.

convey possession of the strip to plaintiffs. There is sufficient evidence to find privity among these possessors. We conclude that Sampsons' interest in the disputed strip was conveyed to subsequent grantees.

After conveyance of the property, Sampsons no longer had an interest in the strip. Their transfer by quitclaim deed to defendants shortly before trial has no effect on plaintiffs' interest in the property.

The Court of Appeals is affirmed.

**LENT, J.,** dissenting.

I dissent from the decision made by the majority and some of the reasoning by which that decision was reached.

Before passing to the main thrust of my opinion, I should like to mention some aspects of this case that I do not believe have been adequately addressed.

On May 22, 1980, plaintiffs filed a cause to quiet title, remove cloud and fix a boundary between their land and that of the defendants. Plaintiffs' cause sounds in equity.[1]

Defendants have denied plaintiffs' claim for relief and have counterclaimed in ejectment, which sounds in law. Defendants did not assert a right to trial by jury on their cause. I can find no reply to the counterclaims in the trial court file. ORCP 13B provides:

"* * * There shall be a reply to a counterclaim denominated as such. * * *"

ORCP 19C provides:

"Allegations in a pleading to which a responsive pleading is required * * * are admitted when not denied in the responsive pleading. * * *"

ORCP 19B provides:

"In pleading to a preceding pleading, a party shall set forth affirmatively * * * statute of limitations * * *."

---

[1] On January 1, 1980, ORCP 2 became effective and provides:

"There shall be one form of action known as a civil action. All procedural distinctions between actions at law and suits in equity are hereby abolished, except for those distinctions specifically provided for by these rules, by statute, or by the Constitution of this state."

ORCP 21G.(2) provides:

> "A defense * * * that the action has not been commenced within the time limited by statute, is waived if it is neither made by motion under this rule nor included in a responsive pleading * * *."

It appears to me that plaintiffs should have been required to reply to the counterclaims, and that if they desired to assert the statute of limitations against those counterclaims, they should have done so by either motion or reply. The failure to do so, it would seem, should entitle the defendants to prevail on their counterclaims to recover the real property or the possession thereof.

It appears, however, that the parties, the trial court, the Court of Appeals and this court have thus far treated the case as if issue had been joined on the counterclaims, and I shall do the same.

I turn first to defendants' counterclaim. It presents an action for the recovery of real property or the possession thereof. ORS 12.050 provides:

> "An action for the recovery of real property, or for the recovery of the possession thereof, shall be commenced within 10 years. No action shall be maintained for such recovery unless it appear that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises in question within 10 years before the commencement of the action."[2]

If trial of the issues presented by the counterclaims was had as a cause at law, the findings of fact of the trial judge have the same effect as if found by a jury. An appellate court is bound by those findings unless the court can affirmatively say that there is no evidence to support them. Or Const Art VII (Amend), § 3. The trial judge found:

> "The Defendants failed to prove by a preponderance of the evidence their affirmative defenses and counterclaims alleged against the Plaintiffs."

This was a general finding and carries with it a resolution of all issues of fact in favor of plaintiffs on those defenses and

---

[2]Of course, for the purposes of defendants' counterclaims, defendants here are the "plaintiff" within the meaning of the statute.

counterclaims. The general finding therefore includes a finding that defendants, their ancestor, predecessor or grantor were not seized or possessed of the premises within 10 years before the commencement of the action.

If the trial of the counterclaims was in the mode of a suit in equity, the trial court found, and I would find from the evidence, ORS 19.125(4), that the plaintiffs, their grantors and predecessors were in possession of the strip, to the exclusion of the defendants, their grantors and predecessors, for the 10 year period preceding commencement of this suit and the filing of the counterclaims.

In sum, either at law or in equity, the defendants have not established, as required by the second sentence of ORS 12.050, that they, their ancestor, predecessor or grantor was seized or possessed of the strip so as to maintain their causes for ejectment.

I now come to the plaintiffs' cause. To plaintiffs' complaint the defendants asserted separate affirmative defenses of laches and the statute of limitations, namely, ORS 12.050.

It appears to me that the proper starting point is ORS 12.040(1), which provides:

> "A suit shall only be commenced within the time limited to commence an action as provided in this chapter; and a suit for the determination of any right or claim to or interest in real property shall be deemed within the limitations provided for actions for the recovery of the possession of real property."

That section obviously implicates ORS 12.050 as a part of "this chapter."

The text of ORS 12.050, as applicable to a suit to quiet title, is to me somewhat puzzling. The second sentence seems relatively easy. It requires that a plaintiff must make a certain showing to "maintain" the suit. The showing is possession by plaintiff, his ancestor, predecessor or grantor within 10 years before commencement of the cause. At common law a plaintiff, or someone holding under plaintifff, had to be in possession in order for plaintiff successfully to assert a suit to quiet title. By statute, ORS 105.605, a plaintiff may maintain a suit to quiet title if plaintiff is in possession or if the property is vacant. *Comegys v. Hendricks,* 55 Or 533, 106 P

1016 (1910). No one contends that this disputed strip was vacant. The evidence is overwhelming that plaintiffs were in possession at the time of filing the suit and that plaintiffs and their grantors, Luckeys, and predecessors, Sampsons, were in possession for the entire 10 year period immediately preceding commencement.

The application of the first sentence of ORS 12.050 is more troublesome. By that sentence, taken together with ORS 12.040 and 12.010,[3] a plaintiff must commence a suit to quiet title within 10 years after the cause accrues. When does a cause of suit such as this accrue? These plaintiffs thought they were buying from Luckeys all of the property up to the fence line. Until something put them on notice that the disputed strip was not described in the deeds from Sampsons to Luckeys and from Luckeys to plaintiffs, they would have no reason to believe that they had a cause of suit and, therefore, to commence one. It seems that everyone involved in deciding this case has thus far been content with resolution of the limitations and laches issues upon the basis that defendants were not able to satisfy the second sentence of ORS 12.050, thereby losing on the counterclaims, and that plaintiff was able to satisfy the second sentence of ORS 12.050. In the circumstances, I shall spend no more time on this point.

I now come to my reasons for disagreeing with the majority.

At common law real actions were classified as either proprietary or possessory. In a proprietary action a plaintiff sued on his right of property if he had lost his right of possession. In a possessory action he sought to vindicate his right of possession, which might be independent of any proprietary right. Koffler and Reppy, Common Law Pleading 48.

"AT [sic] early Common Law a Complete Title to Real Estate included the ultimate right of property, the right of possession, and the actual present possession. As the right of property and the right of possession might be in different

---

[3] ORS 12.010 provides:

"Actions shall only be commenced within the periods prescribed in this chapter, after the cause of action shall have accrued, except where a different limitation is prescribed by statute."

persons while the actual possession was in a third person, actual possession was regarded as a right distinct from the right of property and the right of possession.

"If one having the Complete Title to land was dispossessed, he lost one of the constituent elements of his Title, that is, actual possession. This left remaining in him the right of possession and the right of property. As to all other persons except the person ousted, the disseisor became the owner of the Complete Title; as to the person ousted, he was the owner of the Complete Title, subject to be defeated by enforcement of the disseisee's superior right of property or right of possession. *If such rights were not enforced within certain periods of time fixed by the Common Law or by Statute, the disseisor's Title became indefeasible as to all failing to show a superior right of property or right of possession.*" (Footnote omitted; emphasis added.)

Koffler and Reppy, Common Law Pleading 48-49. ORS 12.040(1) and ORS 12.050 descend to us from the original Deady Code (except for the amendment from a 20 year period to a 10 year period), Deady, General Laws of Oregon, §§ 378 and 4. The early statutes spoke both to the time limited for bringing the proprietary action and the time limited for bringing the possessory action.

Under our early cases cited by the majority and by Justice Campbell, Sampsons' title became indefeasible when the record owners (disseisees) failed for more than a period of 10 years of adverse possession by Sampsons (disseisors) to enforce the record owners' right of property or possession. As the majority notes, citing Tiffany, Real Property § 1135 (3d Ed. 1955), the rationale flowing from a statute of limitations approach is that the disseisor does not prevail except by default of the disseisee in failing to assert his remedy within the statutory period.

Both the majority and Justice Campbell have reached their final results on the basis that Sampsons attained ownership of the strip by adverse possession at the completion of 10 years from Sampsons' entry under their deed; completion was in 1958. This leaves out any inquiry as to whether anyone in the chain of conveyances and possession from the Halls, who built the fence, to Sampsons had earlier acquired ownership by adverse possession for the necessary 10 year period. I do not believe that if that occurred, it affects the

validity of the majority's holding concerning the passing of ownership, but it might be important to Justice Campbell's analysis. At any rate, the evidence in this suit does not permit determination of an earlier ownership than that of Sampsons, blossoming in 1958.

In 1958 Sampsons had obtained by adverse possession the "Complete Title." They had the right of property, the *right of possession and the actual possession.* I would agree with the majority that Sampsons could transfer all, or any, of those constituent elements.

In this case there is no doubt that Sampsons transferred to Luckeys the actual possession. Likewise, Luckeys transferred actual possession to plaintiffs. The evidence is overwhelming that the actual possession of Sampsons commencing in 1948 and continuing through the actual possession of Luckeys and plaintiffs to May, 1980, when this suit was commenced, was open, notorious, hostile, exclusive and under claim of right.

I would hold that, as against these defendants, plaintiffs are entitled to tack that possession of Sampsons, Luckeys and themselves so as to prevail against these defendants upon the basis of adverse possession for the statutory term.

The majority goes further, however, and holds:

> "[W]here there is evidence of intent between grantor and grantee to transfer the grantor's interest in property, the grantee may acquire the grantor's interest, vested and complete, in those situations in which the grantor has adversely possessed for the statutory period."

Based upon that holding, the majority decides that plaintiffs acquired a title good against the whole world. That occurs through the mechanism of affirming the Court of Appeals, which affirmed the trial court, which had so decreed.

My minor quarrel with the language of the majority's holding is that it is predicated upon the existence of evidence of intent rather than the existence of intent itself. Perhaps this is merely a slip of the pen, for the majority goes on to discuss the evidence and to find from that evidence that Sampsons did intend to sell the property to the fence line and so did Luckeys.

My major quarrel with the decision of the majority is that it is based on evidence developed without the participation of Sampsons and Luckeys. Those sellers and grantors have had no opportunity to litigate in this cause the existence of their intent with respect to parting with their ultimate right of property or right to possession thereof. We do not know what evidence they might have presented. For all we know, Sampsons, or Luckeys, might have presented evidence completely refuting that on which the majority relies for its result. At the time this suit was commenced, neither Sampsons nor Luckeys would have been barred by the statute of limitations from prosecuting an action to recover the disputed strip or the possession thereof. We have no way of knowing what evidence they might have marshalled in support of such an action.

Because of the failure of the plaintiffs to join Sampsons and Luckeys, or their successors if any, I would confine the decision in this case to decreeing that, as between these plaintiffs and these defendants, plaintiffs have the better title and that they are, therefore, entitled to have a decree that the defendants and anyone claiming under them are forever barred from asserting any interest in the disputed tract.[4] I cannot agree to affirming a trial court decree that bars the Sampsons and Luckeys from asserting that plaintiffs acquired less than all of the constituent elements of "Complete Title" to the disputed strip.

**CAMPBELL, J.,** dissenting.

Although I dissent in the strongest possible way from the majority's analysis of this case, I do agree with its acknowledgment of one of the basic principles of adverse possession. The majority in referring to *DuVal et ux. v. Miller,* 208 Or 176, 300 P2d 416 (1956) says:

"The principle of property ownership upon which *DuVal* is premised is certainly valid: one who has adversely possessed

---

[4]In this case I give defendants nothing that would flow from the quitclaim deed from Sampsons to defendants' grantor and the possible passing of after acquired title to defendants from that grantor. The quitclaim deed was not given until after defendants filed their first answers and counterclaims. They each, as time went by, filed amended answers and counterclaims, but those related back to the original answers and counterclaims. No supplemental, as distinguished from amended, pleadings were filed to take advantage, if any there be, of the quitclaim deed.

land for the requisite number of years gains ownership rights to land of a status equal to deeded title." 296 Or 752.

The above statement by the majority was not "a slip of the pen" because on page 755 of the majority opinion, it states that when the requirements of adverse possession are met the adverse possessor acquires "perfect title," citing *Spath v. Sales,* 70 Or 269, 273, 141 P 160 (1914).

The vesting of title in the adverse holder upon the expiration of the ten year period has long been recognized in Oregon. In *Anderson v. Richards,* 100 Or 641, 650, 198 P 570 (1921) this court said:

> "Adverse possession of real estate for the period prescribed by the statute of limitations vests a perfect title in the possessor as against the former holder of the title and all the world, and we have seen that he is entitled to all remedies which are incident to possession under written titles. *The title is created by the existence of the facts, and not by an exhibition of them in evidence.* An open, notorious, exclusive and adverse possession for ten years will operate to convey a complete title to the plaintiff as much as any written conveyance: *Parker v. Metzger,* 12 Or 407 (7 Pac. 518); *Mitchell v. Campbell,* 19 Or 198 (24 Pac. 455); *Joy v. Stump,* 14 Or 361 (12 Pac. 929); *Thomas v. Spencer,* 66 Or 361 (133 Pac. 822); *Spath v. Sales,* 70 Or 269, 273 (141 Pac. 160)." (Emphasis added). *See also Neal v. Davis,* 53 Or 423, 435, 99 P 69, 101 P 212 (1909).

The parties agree that between 1948 and 1970 the Sampsons met all the requirements of adverse possession on the tract in question. The Court of Appeals in effect held that the 10 year period ran between 1948 and 1958. 62 Or App 666, 669-670, 663 P2d 34 (1983) Therefore, in 1958 the Sampsons became the owners of the land in fee simple. They could have conveyed, leased, or mortgaged it. They had all the incidents of ownership. They had the full bundle of sticks. The only thing the Sampsons could not do was go to the the courthouse in Washington County and see a record title.[1]

The defendants' predecessors in interest lost the fee simple title to the two and one-half acre tract in 1958 when the Sampsons' adverse possession was complete. They held only a

---

[1]The Sampsons could not, as a practical matter, get a title insurance policy—that is defeated not as a matter of law, but a requirement of a private company that the owner hold the recorded title.

hollow paper title. They could not have maintained an action in ejectment to regain possession of the land because the 10 year statute of limitations under ORS 12.050 had run.

On September 15, 1970, the Sampsons conveyed the land to which they held record title to the Luckeys. In 1974 and 1975 the Luckeys, in turn, conveyed the land to which they held record title to the Evans—the plaintiffs herein. The adjoining two and one-half acre tract in question was not conveyed. There is no evidence to contradict the assertion that the Sampsons still held fee simple but unrecorded title to the two and one-half acres when they sold to the Luckeys in 1970.

If we assume for the sake of argument that the Sampsons intended to convey the two and one-half acre strip but did not and only orally transferred the rights of possession to the Luckeys, what was the status of the title? If one disregards the cause of suit for reformation then on a scale of zero to ten the Sampsons' title was 9.5—it was the whole title less the oral rights of possession. On the other hand, the Luckeys' title was a slim 0.5—the rights of possession under an oral transfer. The Luckeys held only one-half a stick out of the full bundle. The majority is correct when it acknowledges that the possessory rights to land may be transferred by parol. *Vance v. Wood,* 22 Or 77, 29 P 73 (1892). Such an oral transfer does not violate ORS 93.020(1):

> "No estate or interest in real property, other than a lease for term not exceeding one year, * * * can be created, transferred or declared otherwise than by operation of law or by a conveyance or other instrument in writing, subscribed by the party creating, transferring or declaring it, or by his lawful agent under written authority, and executed with such formalities as are required by law."[2]

----

[2]ORS 93.020(1) is not to be confused with the Statute of Frauds, ORS 41.580(5), which provides:

"In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by his lawfully authorized agent; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law:

"(5) An agreement for the leasing for a longer period than one year, or for the sale of real property, or of any interest therein."

Although probably not important to the resolution of this case, the oral possession of real property is a mere license which can be revoked at will by the owner.

After the above detour, we now return to the saga of Sampsons-Luckeys-Evans. Assume further that in 1974 and 1975 the Luckeys intended to convey the two and one-half acre tract to the Evans but did not and only transferred the rights of possession to the Evans by parol. At that point the Sampsons still owned the unrecorded fee simple title and the Evans only obtained the possessory rights by oral transfer from the Luckeys.

On May 22, 1980 the Evans filed their complaint in this case against the record owners of the two and one-half acre tract. The complaint alleged:

> "Plaintiffs and their predecessors, under claim of title for a period exceeding 20 years prior to the commencement of this action, have been in natural, open, visible, notorious, hostile, exclusive and continuous possession of the property * * * claiming exclusive title in fee simple * * * against the defendants and their predecessors in title."

The Sampsons were not joined as party defendants. Only a period of 9 years and 8 months had elapsed since the Sampsons had conveyed the record title of the adjoining land to the Luckeys. It is obvious from reading the Evans' complaint that they were claiming to be the fee simple owners of the tract in dispute by "tacking" their adverse possession to the prior adverse possession of the Luckeys and the Sampsons. The difficulty with the Evans' theory is that after 1958 the Sampsons were not holding the disputed property adversely. Their title had been perfected and they were the owners in fee simple. They could not hold adversely against themselves. If the Evans and Luckeys were claiming to hold the land adversely it had to be against the Sampsons as they were the only fee simple owners. The Evans could have tacked their adverse possession to the Luckeys, but this would have fallen four months short of the ten year period required to obtain title as against the Sampsons. This is explained in *DuVal et ux v. Miller,* 208 Or 176, 183, 300 P2d 416 (1956). A parphrase of a portion of *DuVal* reads as follows:

> "If the plaintiffs [Evans] claimed adversely thereafter, it must have been against [Sampsons], not against the defendant

[record holders], for by the trial court's decision [record holders] had lost title before the [Evans] purchased the property. If the plaintiffs [Evans] desired to acquire the disputed strip from [Sampsons] the owner, they would have to acquire an interest in the land by deed, or themselves occupy it adversely for ten years."

The majority would overrule *DuVal et ux v. Miller, supra,* and solve the problem in the following manner:

"Where the circumstances show an intent to transfer the grantor's interest in the property not included in the deed, we have recognized a transfer of the grantor's interest in those cases in which the grantor's adverse use of the property has been less than 10 years. We see *no reason* why a predecessor's interest in the property attained by possessing the property for the full statutory period cannot be transferred in the same way, so long as there is a similar intent between grantor and grantee. We now hold that where there is evidence of intent between grantor and grantee to transfer the grantor's interest in the property, *the grantee may acquire the grantor's interest, vested and complete,* in those situations in which the grantor has adversely possessed for the statutory period." (Emphasis added).[3] 296 Or at 756.

The above quoted portion of the majority opinion does not say so, but it is based upon the proposition that the transfer of the grantor's interest may be by parol. It follows a quote starting on page 13 of the slip opinion from *Vance v. Wood, supra,* 22 Or at 88 to the effect that it is not necessary that there be a writing for a subsequent occupant to tack his possession to a prior occupant.

The tacking of possession without a writing would be permissible as between the Evans and the Luckeys, but that

---

[3]Apparently the majority is holding that where grantors (the Sampsons) have previously acquired fee simple title to real property by adverse possession and there is evidence of an intent to convey that property to a grantee (the Luckeys), then the fee simple title is transferred "vested and complete" by parol. Then several years later the same process is repeated by a transfer from the Luckeys to the Evans. It is interesting to note that there is no time element involved in the majority's new rule. For example the Luckeys, on the morning following their purchase from the Sampsons, could have commenced a suit to quiet title against the record owners on the two and one-half tracts in question alleging themselves to be the owners in fee simple. The majority both ignores and confuses our traditional concepts of adverse possession and reformation. For example, in the Luckeys' hypothetical suit to quiet title there would be included an additional element—intent of the Sampsons to convey—but the Sampsons would not be parties defendant.

gets them no place—they are four months short of holding adversely against the Sampsons.

The majority says there is no reason, "why a predecessor's interest in the property attained by possessing the property for the full statutory period cannot be transferred" by parol. Wrong. The Sampsons' interest is a fee simple title and can be conveyed only in writing. The majority runs afoul of ORS 93.020(1) which provides:

> "No * * * interest in real property * * * can be created, transferred or declared otherwise than by operation of law or by a conveyance * * * in writing * * *."[4]

---

[4]"Operation of law" is defined in *Woodard Lbr. Co. v. Un. Comp. Com.*, 173 Or 333, 339, 145 P2d 477 (1944):

> "Operation of law: Such phrase is used to describe a method by which title to property is transferred. It includes a transfer by intestacy. A right to an estate of one who dies intestate is cast upon the heir at law by operation of law: *La Chapelle v. U. P. Coal Co.*, 29 Wyo. 449, 214 P. 587. It is a right not acquired by any act of the party in whom the estate is vested but is the effect of the law applicable thereto. In 46 C. J. 114, it is thus defined: 'The obligation of law; its practical working and effect; a term applied to indicate the manner in which a party acquires rights without any act of his own.' To the same effect, see cases collated in 29 Words and Phrases (Perm. Ed.) 578. Bouvier's Law Dictionary (3d Revision) 2417 gives this definition: 'A term applied to indicate the manner in which a party acquires rights without any act of his own;' quoted with approval in *Ray v. Industrial Insurance Commission*, 99 Wash. 176, 168 P. 1121, L. R. A. 1918 F, 561."

Black's Law Dictionary 985 (5th ed 1979), defines "operation of law" as follows: "This term expresses the manner in which rights, and sometimes liabilities, devolve upon a person by the mere application to the particular transaction of the established rules of law, without the act or co-operation of the party himself."

It has been suggested that if the fee simple title created by adverse possession is vested by operation of law, then the "Stepson of *Rohner*" rule proclaimed by the majority in this opinion should also transfer fee simple title by operation of law.

Oregon cases state in effect that title acquired by adverse possession vests by operation of law. *Krueger v. Brooks*, 94 Or 119, 131, 184 P 285 (1919); *Parker v. Kelsey*, 82 Or 334, 343, 161 P 694 (1916).

If we are going to recognize the doctrine of adverse possession in Oregon, then it is an obvious necessity that we acknowledge the fee simple title "created" thereby is under the "operation of Law" provision of ORS 93.020. What the majority fails to completely recognize is that once the 10 year statute of limitations has run, the hatching process is over and a fee simple title has been created—the operation of law phase is completed. Once the adverse possessor has acquired title and desires to convey it, that person should be required to convey or transfer it by an instrument in writing as provided under ORS 93.020.

The above definitions of "operation of law" confirm that under the majority's theory when the Sampsons orally transferred the fee simple title to the two and one-half acres to the Luckeys who in turn orally conveyed to the Evans, it was not by operation of law but by their own individual and voluntary acts. The oral transfer of

There is no way that the Evans and the Luckeys could have obtained the Sampsons' "vested and complete" fee simple title in the two and one-half acre strip except by: (1) a conveyance from the Sampsons, or (2) a suit to reform the prior conveyances, or (3) holding adversely against the Sampsons for the necessary 10 year period.

The majority opinion at 296 Or 745 states: "The question here involves how interests in property acquired by adverse possession can be transferred to subsequent purchasers." The answer is: In the same manner as any other interests in real property are transferred.

The majority has merely taken the "equitable claim" from *Rohner et ux v. Neville,* 230 Or 31, 365 P2d 614, 368 P2d 391 (1962) and dressed it up in a new suit of clothes and boots with straps, for lack of a better name they should call it "The stepson of *Rohner."* The majority's opinion can also be read as an approval of an oral conveyance of Sampson's fee simple title in violation of ORS 93.020(1) or as some form of "reformation by osmosis" whereby the prior conveyances are corrected to include the two and one-half acre tract without making the Luckeys and the Sampsons party defendants.

The majority's resolution of this case will only work if ORS 93.020(1) is repealed or the rule of law in *Anderson v. Richards, supra,* is changed to require the vesting of title in the adverse possessor when decreed by a court instead of upon the expiration of the 10 year period. In other words, the title would be created upon the "exhibition of the facts in evidence" instead of "by the existence of the facts."

The majority cites the case of *Meyer v. Ellis,* 411 P2d 338 (Wyo 1966) as following our case of *DuVal et ux v. Miller, supra,* and concludes that the resulting "uncertainty in property ownership" is "unsatisfactory." Before we shed any tears we must remember that the plaintiffs Evans in this case and the plaintiffs in both *DuVal* and *Meyer* all failed to recognize their proper remedy.[5] The plaintiffs in each case should have

---

the fee simple title to the two and one-half acre tract requires acceptance by the grantees, whereas in adverse possession the title is cast upon the possessor. The adverse possessor does not accept title. He acquires it by operation of law. He is in the same position as an heir at law who receives a devise of real property.

[5] In *DuVal et ux v. Miller, supra,* the plaintiffs DuVals at least partially solved their problems by obtaining quit-claim deeds from three-fourths of the heirs of

filed a suit to reform the original conveyance from their respective grantors to include the land in dispute. In this case the Evans were not in privity with the Sampsons so they would have been required to sue the Luckeys for reformation who in turn could have filed a third party suit against the Sampsons. The Evans also missed one other opportunity. The ten year period of adverse possession against the Sampsons would have expired on September 15, 1980. At that point the Evans could have filed a supplemental complaint setting out a new period of adverse possession and naming the Sampsons as party defendants. The record holders at that point were not necessary parties to the Evans' adverse possession claim, but their record title did constitute a cloud and they could have been joined in a separate cause.[6]

---

Duncan who had acquired title to the property in question by adverse possession. Duncan had conveyed his record title to the adjoining property to the DuVals six or seven years previously. In *Meyer v. Ellis, supra,* it would appear that the plaintiff grandson had acquired the record title to the adjoining property from his grandfather six years prior to the filing of his complaint. The grandfather was deceased. It would appear that if the plaintiff grandson failed to get deeds from his grandfather's heirs he could bring a suit to reform against them. The grandson's other alternative would be to wait until the 10 year statute of limitation expired and file a suit based on adverse possession against not the record owners, but against his grandfather's heirs.

[6]Even though the defendants cannot win in their ejectment action, the Evans may in the future attempt to establish record title to the land in dispute. To accomplish this the Evans will be required to prove adverse possession against the title which the Sampsons acquired in 1958. In other words, the bell in the courthouse may have rung twice—once for the Sampsons in 1958 and then for the Evans in 1980. Because the defendants have lost in this suit does not mean that the plaintiffs will win in a subsequent suit. In a suit to quiet title the plaintiffs must recover on the stength of their own title and not on the weakness of the defendants' title. *Freytag v. Vitas,* 213 Or 462, 466, 326 P2d 110 (1958). The Evans will be required to prove that their possession was actual, open, notorious, hostile, continuous, and exclusive for a period of ten years by clear and positive evidence. *Scott v. Elliott,* 253 Or 168, 178, 451 P2d 474 (1969). In May 1981 the Sampsons quitclaimed their interest in the property to Mary Baker Wall, the prior grantor of the present record holders, the Hogues and Mundt. If Mary Baker Wall had previously conveyed the record title to the Hogues and Mundt by a warranty or bargain and sale deed then any after acquired interest she may have obtained by the Sampsons would be for the benefit of her prior grantees. ORS 93.860(1)(b). The Hogues and Mundt would then be proper parties to defend the Sampsons 1958 title in any subsequent suit to quiet title brought by the Evans. In the opinion of this writer a future suit to quiet title brought by Evans would not be barred by res judicata. *See Bessler v. Powder River G. Dredging Co.,* 90 Or 663, 176 P 791, 178 P 237 (1919). The future suit would be aimed at the title the Sampsons acquired in 1958 and not against the record title. If there was question about the suit to quiet title clearing the record title the Evans could join a separate cause of suit to remove a cloud from the title. The Hogues and Mundt would be proper parties in both causes of suit.

I would hold that *DuVal et ux v. Miller, supra,* is good law. By the very nature of adverse possession it is necessary to the orderly application of the property law in Oregon. I would overrule those parts of *Rohner et ux v. Neville, supra,* which are inconsistent with this dissent.

As to the disposition of this case I would find that the defendant record holders are barred by ORS 12.050 from maintaining their ejectment action. The quit claim deed from the Sampsons to the defendant's prior grantor in May 1981 does not help the defendants. The Sampsons' interest was also barred by ORS 12.050—more than ten years had elapsed from his possession which ended on September 15, 1970 when he conveyed the record title to adjoining property to the Luckeys. The plaintiffs' complaint should be dismissed.

I dissent.